Alec Rose No. 165983
Certified Criminal Law Specialist
Law Office of Alec Rose, PC
12121 Wilshire Blvd., Suite 740
Los Angeles, CA 90012
(310) 877-5398
alec@alecrose.com

Attorney for Sagi Schwartzberg

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>                    Plaintiff,<br><br>vs.<br><br>SAGI SCHWARTZBERG,<br>                    Defendant. | Case No.: 5:21-cr-00148-VAP-1<br><br>SENTENCING BRIEF SUBMITTED BY DEFENDANT SAGI SCHWARTZBERG<br><br>Sentencing Date April 4, 2022<br>Judge: Virginia A. Phillips,<br>                    United States District Judge |

Defendant Sagi Schwartzberg (hereafter "Defendant" or "Mr. Schwartzberg") respectfully submits this Sentencing Brief:

## I.   RELEVANT CASE INFORMATION

### a.   THE DEFENDANT

Before the Court stands Mr. Sagi Schwartzberg. Mr. Schwartzberg was born and raised in Israel in a close-knit community and loving family. He was raised with "values of honesty, contribution to [] Society, charity, help[ing] the less fortunate, and respect for others." (See Gabriela Schwartzberg's character/support letter, Exhibit "A" attached).

When he was eleven years old, his family immigrated to the United States, including his parents, younger brother, and baby sister with him. Throughout his teen years, he attended school, played sports, and learned to play the electric organ ("Electone."). At the age of fifteen, he obtained his first employment as a cashier at McDonald's.

After High School, Mr. Schwartzberg pursued higher education, while still working and playing the electric organ. In fact, when he was nineteen, he won Second Place in an International Electone Competition in Spain. Mr. Schwartzberg earned his Bachelor of Science Degree in Political Science from Cal State Northridge in 2006. In 2010, he earned his Juris Doctor Degree from the University of La Verne College of Law. He passed the California Bar Exam and was sworn in as an Attorney in December 2010.

Shortly thereafter, Mr. Schwartzberg opened his own law practice. Since then he "developed his career with hard work and absolute dedication, and became committed to helping his fellow colleagues and young or aspiring lawyers reach their full potential and develop their own career[s]." (See Gabriela Schwartzberg's Letter, Exhibit "A") He constantly gave young lawyers and mentees "opportunity to begin [their] career despite [their] lack of experience," (See Arie Schmulian's character/support letter, Exhibit "A") and "provided monetary contributions to his mentees and/or employees studying for the Bar and many more." (See John Settich's Character/Support Letter, Ex. "A") Mr. Schwartzverg "was a talented lawyer who sought to protect individuals from insurance companies and school districts. At the same time, he did a lot of pro bono work." (See Lior Schwartzberg's Character/Support Letter, Ex. "A") Such pro bono work included representing his brother in an employment case that required travel to different states (*Id.*), helping a young woman navigate the complex family law system (See Yunna Mirolyan's Character/Support Letter,

Defendant's Sentencing Brief - Page 2

Ex. "A"), fighting a bank to save his friend's home (*Id.*), protecting a victim of online sexual harassment by an ex-boyfriend (See Barrie Guttman's Character/Support Letter, Exhibit "A"), and providing free services and advice to countless friends, colleagues, and family members (See Character/Support Letters (all), Exhibit "A").

While helping clients and others professionally, Mr. Schwartzverg was also a dedicated husband, father, friend, and family man. When he found out that his younger sister was in danger, he drove four hours out of state in the middle of the night to bring his sister back home to safety. (See Dana Schwartzberg's Character/Support Letter, Exhibit "A") He loaned money to his friends so they could advance their own careers (See Roy Chingirian's Character/Support Letter, Exhibit "A"); he was "one of the kindest and most giving people [his now ex-wife] has ever known … the care and attention to his family, friends, and colleagues throughout [his] early years [of marriage], multiplied so many times over once he became a father." (See Rebecca Schwartzberg's Character/Reference Letter, Exhibit "A"; See also Photographs, Exhibit "C")

Mr. Schwartzberg was an outstanding member of society who used every chance he had to elevate and improve the lives of others. (See Character/Support Letters (all) Exhibit "A"). Unfortunately, Mr. Schwartzberg developed a personal challenge that he failed to recognize and properly address, which spiraled into the offense conduct in this case, conduct that shocked everyone who knew him (*Id.*). Mr. Schwartzberg has taken full responsibility for his conduct, has undergone a mental health evaluation to discover the source of his conduct, and is determined to do whatever it takes to rehabilitate and atone for his conduct.

      b.  THE OFFENSE AND RELATED CONDUCT

Several years ago, in or about 2018, Mr. Schwartzberg commenced purchasing sexually explicit photographs and/or videos from women who advertised on SnapChat, Kik, and other Social Media platforms and websites where these women sold sexually explicit photographs and/or videos of themselves. Additionally, some of these women advertised other women who also sold sexually explicit materials depicting themselves. As part of the purchase transactions, Mr. Schwartzberg admittedly engaged in conversations with the women about the type of content they sold, whether their materials are pre-recorded or they were willing to take requests to produce customized content, the prices they would charge for their materials, methods of payment, and the like. When Mr. Schwartzberg received the sexually explicit materials, he further chatted with the sellers in a sexual nature, which included "dirty talk" and/or sexual activities that Mr. Schwartzberg would like to engage in with them. Mr. Schwartzberg saved the materials he obtained if the women agreed to have the content saved by the purchaser.

Because Mr. Schwartzberg was married, with a family, and had a promising career, to shield his true identity, Mr. Schwartzberg used fictitious names on the Social Media platforms where he sought the sexually explicit materials. In order to save the content where his wife would not discover it, Mr. Schwartzberg downloaded an application called "Photo Vault." This app was a photo/video gallery that required a separate passcode apart from the regular photo gallery on his phone. Concurrently with his purchasing activity, Mr. Schwartzberg also joined several pornography groups on Kik, where unknown users would send pornography to the group.

In late 2019 or early 2020, Mr. Schwartzberg's pornography consumption increased and spiraled out of control. This unfortunately included his virtual presence in Kik

Defendant's Sentencing Brief - Page 4

chatgroups where anonymous users shared child pornography. In or about November of 2020, the Fontana Police Department's Internet Crimes Against Children's Task Force ("Fontana ICAC") received a "Cybertip" that a Kik user shared suspected Child Sexual Abuse Material ("CSAM") with another user or group of users.

Upon investigation, Fontana ICAC determined that the suspected IP addresses from where the CSAM was shared were located at Mr. Schwartzberg's residence and his law office. Fontana ICAC also learned that a different Kik user was believed to have shared suspected CSAM in February 2020 and that the San Bernardino Sheriff's Department ("SBSD") received a Cybertip in May 2020 with IP addresses matching Mr. Schwartzberg's residence and prior office address in Rancho Cucamonga.

On or about February 17, 2021, Fontana ICAC and SBSD executed search warrants at Mr. Schwartzberg's residence and law office in Ontario, CA. At that time, Mr. Schwartzberg was home and agreed to talk to law enforcement. He even provided them with consent to search his phone and his laptop computer and provided the passcodes to both devices. During his conversation with law enforcement, Mr. Schwartzberg acknowledged that he previously used Kik, and that he was previously involved in chat groups where child pornography was shared. However, Mr. Schwartzberg also informed the officers that he had deleted the Kik application several months prior and that he had used a fictitious name but was unable to recall what the username actually had been. Upon being questioned about the sharing of CSAM, Mr. Schwartzberg told the investigator that he never uploaded any CSAM, but may have forwarded some of the materials from one group to another, or to another user. During the execution of the search warrants, no CSAM was found on the

laptop or office computers, and his cell phone was seized for further forensic examination. Mr. Schwartzberg was arrested that morning and was subsequently released on bail.

A subsequent forensic examination revealed the materials that were saved in the "Photo Vault" application and further CSAM that was in the Kik application's deleted cache files, as the Kik application was no longer installed on the phone. The materials saved in the "Photo Vault" were saved in folders containing different names. Upon review, Fontana ICAC believed that some of the folders contained photos and videos depicting females who appeared to be minor girls. Fontana ICAC identified two minors whose photos and videos were found, interviewed them, and learned that they sold sexually explicit CSAM online and that Mr. Schwartzberg had purchased this material. Fontana ICAC also learned that Mr. Schwartzberg would request the kinds of photos and videos that he wanted to see and would have conversations of a sexual nature with them. While the two minors stated that Mr. Schwartzberg discussed having sex with them and/or meeting in person, they never met him and no meeting was ever planned.

Victim 1 informed Fontana ICAC that she received payment for her photos and videos via Vanilla Visa Gift Cards; Victim 2 informed Fontana ICAC that she received payment for her materials via the Venmo or CashApp Applications. Fontana ICAC's review of Mr. Schwartzberg's cell phone, including his Venmo and CashApp transaction history revealed that Mr. Schwartzberg was purchasing materials from various sellers. Fontana ICAC identified two more females whom they believed to be minors when they had transacted with Mr. Schwartzberg. Fontana ICAC and the Federal Bureau of Investigation then contacted the two minor females, who both lived in Minnesota. They learned that

Defendant's Sentencing Brief - Page 6

Victim 3 met Mr. Schwartzberg on a website and Victim 4 had either met Mr. Schwartzberg through a website or through Victim 3.

Lastly, Fontana ICAC learned that Victim 5 received money from Mr. Schwartzberg on Venmo and during a phone interview she disclosed that she was seventeen when she used to sell photos and videos of herself on Kik.

Victim 1 through 4's materials were found in Mr. Schwartzberg's "Photo Vault" along with hundreds of other sexually explicit content material of females who were not and did not appear to be minors. It is further noteworthy that none of the photos or videos of Victim 3 found on the phone depicted her while she was still a minor, but there were transactions with her on Venmo from when Victim 3 was still seventeen years old.

### c.   PROCEDURAL HISTORY

Mr. Schwartzberg was arrested by Fontana ICAC and SBSD on February 17, 2021, and he posted bail later that day. On or about March 1, 2021, the State of California filed a felony complaint against Mr. Schwartzberg, charging him with no photos or videos of Victim 5. The only evidence available related to Victim 5 was that Mr. Schwartzberg sent her money on the Venmo application. Mr. Schwartzberg was charged with the following counts: Four counts of Penal Code Sec. 311.4 – Use of a Minor for Obscene Matters/Commercial Purpose; Four counts of Penal Code Sec. 288.3(a) – Contact with a Minor for Sexual Offense; and One count of Penal Code Sec. 311.1(a) – Sending or Selling Obscene Matter Depicting a Minor.

On that same date, the State of California moved ex parte to increase Mr. Schwartzberg's bail to $800,000.00. The motion was granted and Mr. Schwartzberg was remanded into custody that afternoon, where he remains today, 399 days later as of April

4, 2022, the scheduled sentencing date for this case. The counts in the State of California felony case all related to Victim 1 and Victim 2.

On or about April 28, 2021, while Mr. Schwartzberg remained in custody on the State charges, the United States filed the Complaint in this case, under seal. As a result, the United States Marshal's Service placed a hold on Mr. Schwartzberg's custody status with the State of California and County of San Bernardino, where Mr. Schwartzberg's state-level criminal case was pending and where he was incarcerated.

On or about June 16, 2021, the State of California dismissed its case as a result of the U.S. Marshal's hold and pending federal criminal case. As a result of the hold, Mr. Schwartzberg remained in custody until he was arraigned in this case on one count of production of Child Pornography on June 18, 2021[1]. After some negotiation with the United States Attorney, Mr. Schwartzberg and the United States entered into the Plea Agreement herein, which called for a stipulation per Federal Rule of Criminal Procedure 11(A). The pertinent terms of the Plea Agreement are that the United States would file a one-count Information, consisting of a violation of 18 U.S.C. 2252(A) – Receipt of Child Pornography; Mr. Schwartzberg would plead Guilty to that Count; that Mr. Schwartzberg would recommend a sentence of no less than ten years of imprisonment followed by a further ten years of Supervision with numerous restrictions and conditions; and the United States will seek a term of imprisonment of no more than twenty years and will not further prosecute

---

[1] As of April 4, 2022, the scheduled sentencing date for this case, 290 days will have passed from Mr. Schwartzberg's arraignment herein.

Defendant's Sentencing Brief - Page 8

Mr. Schwartzberg for the conduct related to the February 4, 2021 and March 1, 2021 arrests. (See Plea Agreement).

On or about July 26, 2021, a one-Count Information was filed herein charging Mr. Schwartzberg with violation of 18 U.S.C. 2252(A) – Receipt of Child Pornography. On or about August 3, 2021, Mr. Schwartzberg pleaded Guilty to this Information before this Court.

On or about December 20, 2021, Mr. Schwartzberg was examined by Dr. Lydia Bangtson, Ph.D., a Forensic Psychologist, while incarcerated at West Valley Detention Center. On or about January 3, 2022, Mr. Schwartzberg was served with Order from the State Bar of California providing that as of January 24, 2022, his License to Practice Law would be suspended.

II.  SENTENCING MEMORANDUM

In sentencing a criminal defendant, the Court is bound by 18 U.S.C. 3553(A). Under this Section, the key requirement is that the Sentence in each case must be "sufficient, but not greater than necessary" to (a) Reflect the seriousness of the offense to promote respect for the law, and to provide for just punishment for the offense; (b) Afford adequate deterrence for criminal conduct; (c) Protect the public from further crimes of the defendant; and (d) provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. (18 U.S.C. 3553(A)(2)) In addition, the Court must also consider: (1) The nature and cicumstances of the offense and the history and characteristics of the Defendant (18 U.S.C. 3553(A)(1)), (2) The kinds of sentences available (18 U.S.C. 3553(A)(3)), (3) The Guideline Sentencing range (18 U.S.C. 3553(A)(4)), (4) Any pertinent policy statements issued by the Sentencing

Commission (18 U.S.C. 3553(A)(5)), (5) The need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. 3553(A)(6)), and (6) The need to provide restitution to any victims of the offense ( 18 U.S.C. 3553(A)(7)).

Pursuant to *United States v. Booker,* 543 U.S. 220 (2005) and its progeny, the Sentencing Guidelines are advisory and while a District Court must consider the Guidelines, it need not impose a sentence within the Guideline Range, even if there are no grounds to depart.

In this case, the stipulated Sentence of ten years imprisonment, followed by ten years of Post Release Community Supervision is sufficient but not greater than necessary to comply with the purpose set forth in 18 U.S.C. 3553(A)(2).

      a.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND CHARACTERISTINGS OF THE DEFENDANT

          i.   HISTORY AND CHARACTERISTICS OF THE DEFENDANT

While the advisory guideline policy statements largely preclude consideration of the defendants age, level of education, mental and emotional condition, employment history, family ties and responsibilities, or civic contributions (See Guidelines 5H1.1 to 5H1.11), such policy statements are no longer binding on District Courts. Rather 18 U.S.C. Sec. 3661 provides that "no limitations shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense for which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statutory directive conflicts with and overrides the provisions of the advisory guidelines.

Thus, the court may impose a sentence outside of the Guideline Range based on factors precluded from consideration under the Guidelines. (see *United States v. Ranum* 353 F. Supp. 2d 984, 985 (E.D. Wisconsin 2005). This case is such a case.

Mr. Schwartzberg is currently 39 years old. Prior to the offense, he led an exemplary life. He had dedicated himself to helping others, and has achieved high education affecting his life goals of contributing to and being a positive member of society. He had been gainfully employed since high school and always worked hard to do better for others and himself. The Character/Support letters attached full of specific examples of how Mr. Schwartzberg was dedicated to helping others (See Exhibits "A" and "B"), personally and professionally.

Personally, Mr. Schwartzberg is close to his family, loved by his family, and supported by them. His kindness and compassion increased once he became a father. His children mean everything to him. Once he was incarcerated, he created a cartoon character and wrote books for his children to help them cope with his absence (See Exhibit "D" – excerpts from book written by Mr. Schwartzberg). Professionally, he contributed to the greater good. As a poignant example, attached as Exhibit "E" is the published opinion in the case Leroy v. Yarboi. In that case, Mr. Schwartzberg championed the parents of a High School aged child who took his own life after suffering from bullying at school. Mr. Schwartzberg's clients faced overwhelming odds as California law is extremely forgiving of School Districts. Mr. Schwartzberg fought the case, and appealed the granting of a Summary Judgment hoping to obtain justice for this family and the families and survivors of future bullying victims.

Defendant's Sentencing Brief - Page 11

That case, like others, is one where Mr. Schwartzberg received no compensation for his work while he undertook the expenses of the litigation on his own. While his efforts failed, his advocacy for this family shows his dedication to protect vulnerable individuals and contribute to the public good.

In an effort to understand and resolve the underlying issues that contributed to the offense conduct, Mr. Schwartzberg was examined by Dr. Lydia Bangtson, a Forensic Psychologist. Dr. Bangtson indicates that Mr. Schwartzberg's mental condition of extreme stress and anxiety, and his lack of coping skills, contributed to his commission of the instant offense (See Exhibit "F"). Mr. Schwartzberg is extremely remorseful and regrets his conduct. He does not shy away from it and has openly discussed it with friends, family, and colleagues (See Exhibits "A" and "B").

  b. NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Schwartzberg does not dispute the fact that the instant offense is serious. He has repeatedly told family, friends, colleagues, and the Probation Officer how ashamed he is of his conduct and how terrible he feels for everyone he hurt. However, the Court is urged not to view the facts of the offense in a vacuum. Rather, the Court should consider the totality of the circumstances that are involved in the offense.

First, it is vital for the Court to understand why Mr. Schwartzberg committed these acts. As Dr. Bangtson indicates, Mr. Schwartzberg exhibits "a pattern of compulsive, inappropriate behaviors related to poor affect regulation and poor coping with life stressors" (See Exhibit "F" p.11). "He exhibits poor frustration tolerance and uses compulsive addictive behaviors, including looking at pornography and promiscuous acting out to manage stress and anxiety (*Id.,* p.12)."

While Mr. Schwartzberg makes no excuses for his conduct, the nature of his offense did not specifically target minors; his conduct in the instant offense was intertwined with a larger issue with pornography. He was a consumer of pornography, and sought to purchase sexual material from the minor victims. It is notable that the victims of the offense sold their materials to other willing purchasers including Mr. Schwartzberg. Mr. Schwartzberg admits to being willfully indiscriminate of the victims' ages and purchasing material from Victim 1 while knowing she was a minor; but there is no evidence that Mr. Schwartzberg had actual knowledge that the other victims were underaged, only that he was willfully ignorant of this fact. This is not a defense and Mr. Schwartzberg does not assert that it is, but such lack of knowledge is directly related to Mr. Schwartzberg's culpability *involved with the commission of the offense.* For consideration, it is noteworthy that Venmo and CashApp require verification that a user is over the age of 18 (Exhibit "G"). This is how Mr. Schwartzberg paid Victims 2 through 5.

  b. THE NEED FOR THE SENTENCE IMPOSED TO –

    i. Reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

The offense is serious and the Stipulated Plea Agreement reflects it in the number of years Mr. Schwartzberg will be imprisoned and closely supervised for years thereafter. Ten years of imprisonment and ten years of Supervision reflects how serious the offense is. Aside from the imprisonment and Supervision, Mr. Schwartzberg will suffer other significant and far greater punishments.

    a. Collateral consequences.

Defendant's Sentencing Brief - Page 13

Mr. Schwartzberg, a licensed attorney, will be permanently disbarred as a result of the conviction. As a result, Mr. Schwartzberg already lost ownership of his law firm, lost his income and property, and has been divorced by his wife. Further Mr. Schwartzberg will be required, per *California Penal Code* Sec 290, to register for life as a sexual offender. He has been shunned by his community and lost some of his best friends.

ii.      Afford adequate deterrence to criminal conduct

In addition to incarceration for at least ten years, Mr. Schwartzberg will be subjected to highly restrictive terms of supervision for at least ten additional years. Such terms will restrict where he may live, computer usage monitoring, where he may work, and his travel.

iii.      Protect the public from further crimes of the defendant

There is little to no empirical data to support a causal connection between child pornography and the commission of contact offenses. (see *e.g.* David L. Riegel, *Effect on Boy-Attracted Pedosexual Males of Viewing Boy Erotica,* 33 *Archives of Sexual Behavior* 321 (2004)).

One study looking at reoffense rates for adult male child pornography offenders found that while 4% of child-pornography-only offenders (no prior sex offense convictions) committed a further pornography offense, only 1% escalated to a contact sexual reoffense. (Michael C. Seto and Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders, Sexual Abuse: A Journal of Research and Treatment* Volume: 17 Issue: 2 (2005)).

Another study found that "there is some indication to suggest that there is a sub-group of internet offenders who pose a risk of repeated internet pornography offending but not an escalation to contact sec offending. [B]y far the largest subgroup of internet

offenders [including those convicted of making child pornography] would appear to pose a very low risk of sexual recidivism." (L. Webb, J. Craissati, and S. Keen, *Characteristics of Internet Child Pornography Offenders – A Comparison with Child Molesters, Sexual Abuse: A Journal of Research and Treatment* Volume 19 Issue 4 (2007)).

Finally, after analyzing six years of recidivism data of 231 men convicted of pornography offenses, a study found: "Among the subjects of the present study, only 1% were known to have committed a past hands-on sex offense and only 1% were charged with a subsequent hands-on sex offense in the 6-year follow up. The consumption of child pornography alone does not seem to represent a risk factor of committing hands-on sex offenses in the present sample-at least not in those subjects without prior convictions for hands-on sex offenses." (Jerome Enders, *et al., The Consumption of Internet Child Pornography and Violent Sex Offending, BMC Psychiatry* Volume 9, Article No. 43 (2009)).

This research, coupled with the report provided herein by Dr. Bangtson, confirms the isolated nature of Mr. Schwartzberg's conduct and the low risk of reoffending or escalated offending.  As Dr. Bangtson indicates, Mr. Schwartzberg "does not have a particular preoccupation with minors, rather he engages in sexually inappropriate behaviors as a way of distracting himself from anxieties and frustrations related to life stressors." (See Exhibit F, p.12) After scoring Mr. Schwartzberg on the "Child Pornography Offender Risk Assessment Tool" ("CPORT"), Dr. Bangtson scored him a 0; and notes that "[o]ut of 100 individuals involved with child pornography, *none* would be expected to have a lower score, 18 would have the same score, and 82 would have a higher score (*Id.* P.11)."

The foregoing research, coupled with Dr. Bangtson's examination and report, confirms the isolated nature of Mr. Schwartzberg's conduct and the low risk of reoffending

or escalated offending. Mr. Schwartzberg suffers from conditions that are treatable with psychotherapy and medications. He does not suffer from compulsions or psychoses that would make it much more difficult to assure that treatment would be successful and/or that he would not gain the capacity to regulate his behavior through effective treatments. There is essentially negligible risk to the public that Mr. Schwartzberg is at risk to reoffend.

> iv. Provide the Defendant with needed educational or vocational training, medical care, or other corrective treatment in the most effective manner.

Mr. Schwartzberg pursued higher education to be a college graduate and a lawyer. His license will be revoked and he will be unable to ever again practice law. If he receives a ten year sentence, he will be released at an approximate age of 48. At this age, he is more likely to obtain employment or be able to seek education and training suitable for new forms of employment. He will also be able to seek appropriate mental health treatment.

However, if he is sentenced to a longer term, his ability to obtain gainful employment will be diminished, as it becomes significantly more difficult to obtain employment with no work experience after the age of 50. Also, while the Bureau of Prisons has mental health care, Mr. Schwartzberg will be able to obtain more effective treatment outside of a prison setting.

c.     THE KINDS OF SENTENCES AVAILABLE

The current offense provides for a mandatory minimum term of five years of imprisonment, and a maximum term of twenty years. It further provides for a supervised release period of five years to lifetime. The Plea Agreement herein provides for a sentence of imprisonment from ten to twenty years followed by ten years of Supervised Release.

Defendant's Sentencing Brief - Page 16

Mr. Schwartzberg respectfully urges the Court to impose a sentence of ten years of imprisonment,, to be followed by ten years of Supervised Release with the terms and conditions set forth in the Plea Agreement.

    d.     THE GUIDELINE SENTENCING RANGE

The United States Supreme Court recently emphasized that guidelines not supported by empirical data are entitled to less deference than are guidelines that exhibit the Sentencing Commission's "exercise of its characteristic institutional role" as an expert agency tasked with promulgating empirically-based guidelines. (See 28 U.S.C. Sec. 991(b)(1)(c), 994 (describing the empirical starting point for promulgating the guidelines and independent development of the same); *Spears v. United States,* 555 U.S. 261 (2009) (internal quotation marks omitted; explaining *Kimbrough v. United States,* 552 U.S. 85, 109 (2007)).

The child pornography guidelines, like those for crack cocaine, are not based on empirical research and should receive little deference. (See *United States v. Grober,* 595 F.Supp 2d 382, 392-393 (D. NJ 2008); *United States v. Phinney,* 599 F.Supp.2d 1037, 1040 (E. Dist. Wisc. 2009)).

From 1994 to 1995, child pornography offenders received a mean sentence of 36 months and the 24 offenders convicted only of possessing illegal images received a mean sentence of 15 months' confinement. (Stabenow, Troy, *Deconstructing the Myth of Careful Study, A Primer on the Flawed Progression of the Child Pornography Guidelines,* Jan. 2009). By 2007, the mean sentence for a child pornography offender had grown to 109.6 months. This represents more than a 300% increase in the typical imposed sentence. *Ibid.* The

changes to the child pornography guidelines, however, did not result from an empirical need for consistently harsher sentencing:

> [T]hese changes [were] largely the consequences of numerous morality earmarks, slipped into larger bills over the last 15 years, often without notice, debate, or study of any kind. Congressionally mandated changes were enacted to prevent the commission from implementing carefully considered modifications which would have lowered the applicable offense levels. (*Id.* At 3)

In *United States v. Henderson,* 649 F.3d 955 (9th Cir. 2011) the Court held that "District Courts may vary from the child pornography guidelines [], based on policy disagreement with them and not simply based on an individualized determination that they yield an excessive sentence in a particular case." (*Id.* At 963) In so holding, the Ninth Circuit joined the Second and Third Circuits in finding that these child pornography guidelines are worthy of little to no weight at sentencing (See e.g. *United States v. Dorvee,* 616 F.3d 774 (2d. Cir. 2010) and *United States v. Grober,* F.3d 592 (3rd Cir. 2010)).

In this case, as in countless other child pornography cases around the country, the Guideline Range of 240 months lacks empirical data to support its harsh result and therefore should not bear weight in consideration of the sentence for this case.

e. ANY PERTINENT POLICY STATEMENTS ISSUED BY THE SENTENCING COMMISSION

There are three situations in which guideline policy statements state that departures may be appropriate.

The first is where the case involves a factor not mentioned in the guidelines at all. These factors are unique to the case in question. Among these factors are that the victims in

the case were post-pubescent, high school aged girls who were already ensconced in the sale of sexual explicit images, as opposed to minors that the Defendant groomed and seduced into the conduct and that Mr. Schwartzberg deleted the Social Media platform he had been using to commit the offense conduct prior to its discovery by law enforcement, indicating that to some degree his moral compass was sufficiently intact that he abandoned the offense conduct on his own.

The second is where the case involves an "encourage" departure listed in Guidelines 5K2.1 to 5K2.20. While Mr. Schwartzberg does not suffer from a traditional diminished capacity, per 5K2.13, Dr. Bangtson's report illuminates how his deficient coping skills and inappropriate responses to anxiety and stressors contributed to the offense conduct.

The third is a situation in which Guideline policy statements recognize that departures may be appropriate is where a case involves a "discourage" factor to an extraordinary degree. These include age, education, civic and charitable contributions, or employment records of the Defendant. This applies here. Mr. Schwartzberg has a high level of education and numerous civic contributions mentioned in his Character/Support letters. It should also be considered that Mr. Schwartzberg deleted the Kik app from his phone prior to the discovery of his crimes, showing a voluntary desire to relinquish the means of continuing to commit his crimes.

    f.   THE NEED TO AVOID UNWARRANTED DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT

In order to prevent "unwarranted disparities" a review of sentences imposed in similar state cases is appropriate. *United States v. Ringgold,* 571 F.3d 948, 952 (9th Cir.

2009). The Court is urged to consider the sentencing ranges in California for relevant similar offenses. *Cal. Penal Code* Sec 311.11, Possession or control of matter depicting minor engaging in or simulating sexual conduct, carries a sentence for first time offenders of up to three years in state prison, with eligibility for probation with a sentence of up to one year in county jail. *Cal. Penal Code* Sec. 288.3, Communication with a minor to commit a sexual offense, reflecting the offense conduct stated in the Plea Agreement in this case, carries the same sentence as the underlying offense, in other words, a maximum prison sentence of three years. *Cal. Penal Code* Sec. 311.4, Employing a minor to perform prohibited acts, also reflecting the offense conduct stated in the plea agreement in this case, also carries a maximum sentence of three years.

Additionally, California voters overwhelmingly approved Proposition 57 in 2016, which provides that offenders of nonviolent conduct/offenses including sex crimes serve 33% of their sentence. The disparity between California law and Federal law here is astounding. If a defendant is prosecuted in California's state courts and receives the maximum sentence of three years, she or he will be released in one year. The minimum sentence provided under this plea agreement is 1000% higher. If the Court imposes the Guideline range of twenty years, it will effectively sentence Mr. Schwartzberg to serve 2000% of the time he would have received in California state courts.

The Court is allowed to give consideration to this disparity and is urged to consider the inequity of imposing greater or lesser sentences on offenders who commit the same crime, in the same state, based solely on the fact that some are prosecuted by state officials and some by federal officials.

Furthermore, the ten years provided by the Plea Agreement is also significantly higher than the median sentence imposed on offenders convicted of the same crime. In 2020, 90.1% of offenders sentenced for the Receipt of Child Pornography were first time offenders, who received a median sentence of 86 months. The 120 month sentence required in this case is nearly 50% higher than the median sentence imposed in 2020. (See Quick Facts Sheet 2020 Child Pornography Offenses, United States Sentencing Commission, Exhibit "H").

      g.    RESTITUTION TO THE VICTIM

Mandatory restitution in child pornography cases is not automatic. In order for a victim of child pornography to obtain restitution, there must be a showing that the offender's conduct was a "Proximate Cause" of the victim's harm (See *United States v. Laney* 189 F.3d 954, 965 (9th Cir. 1999; *Paroline v. United States* 134 S.Ct. 1710, 1722 (2014)).

To date, no information has been provided regarding the loss, if any, suffered by the victims and whether Mr. Schwartzberg's conduct was the "proximate cause" of any harm.

## III. CONCLUSION AND RECOMMENDATION

Everyone, including Mr. Schwartzberg, shares outrage regarding conduct that harms and abuses children. In light of this, different levels of accountability are needed for the various crimes involving child pornography. While such offenses create a visceral reaction, sentencing must still comport with reasoned and dispassionate application of the law and take into account the nature of the offender as much as the nature of the offense.

As the factors in Sec. 3553(A) provide, Mr. Schwartzberg's sentence should focus more on counseling, treatment, prevention, and monitoring, than on achieving the lengthiest possible prison sentence. The Guideline for child pornography offenses,

especially in this case simply do not achieve a parsimonious use of resources nor a just result.

A sentence of ten years (120 months) followed by ten years of supervision is a just sentence. It is sufficient, but not greater than necessary to achieve the goals set forth in Sec. 3553(A)(2).

Respectfully Submitted this 14th of March 2022

BY:_____
    ALEC ROSE
    Attorney for Defendant SAGI SCHWARTZBERG

EXHIBIT A

July 22, 2021

Dear Your Honor:

I am writing in regards to the sentencing of Sagi Schwartzberg.

I have known Sagi for more than 10 years. In that time, I have worked with him in trial on a few occasions as a consultant. Sagi has also represented a few of my clients in court, as well as assisted them in business transactions. He has also represented me in a few cases (all of which he handled on a pro bono basis).

I understand that this letter is regarding who he is, and I feel that he has continuously fought for the underdog to the best of his ability. He has been the first attorney to give free time and consulting to the underprivileged.

I further understand that there is a range for his sentence. I believe that Sagi has more to give society and, after the term you impose, he will surely aid people in some amazing capacity. I submit to you that whatever sentence you give will be just. My only hope is that it's the lower range, as he is truly remorseful for his actions in my opinion.

Thank you for your consideration.


Respectfully,

Jon Crittenden

Roy Chingirian
23084 Via Pimiento
Mission Viejo Ca 92691

July 11, 2021

Re: Sagi Schwartzberg

To The Honorable Judge,

My name is Roy Chingirian, Sagi Schwartzberg and I have been great friends for the last 20 years. Sagi and I have shared many life experiences together. We have lived together, we have traveled in and out of the country together and have become best friends throughout the years. We love the same type of music, share the same type of comedy and have a passion for soccer. We have watched each other become husbands, fathers and business men. I have always leaned on Sagi for advice; personal and business related and he has always been there for me.

Sagi is a person who works hard and has respect for people who work hard. I came to Sagi many years ago, when I was trying to advance my career as a youth soccer coach. He loaned me the money for both my national licenses because he knew at the time that it was the only way I could take the next step to better my career. I know numerous friends and acquaintances that Sagi has helped over the years with legal advice always at no charge. Sagi will always use his knowledge and experience to help those around him.

I understand the severity of the accusations against Sagi. As I work with children, I do not want to undermine the seriousness. I know that he is resentful of his actions and the Sagi I know will take all necessary steps in order to rehabilitate himself and work tirelessly to gain the trust of all of those around him. Most importantly including his wife Becky, and children Leo and Emma. I want to thank you for taking your time in reading my letter. For me, this is a very difficult letter to write as I have a reading disability and I am dyslexic. But this man, Sagi, has never judged me for it, has always helped me spell check text messages, email and letters for me. For that, I am grateful for him.

Respectfully,

Roy Chingirian

Roy Chingirian

June 23, 2021

Your Honor,

I am writing this letter to you with respect to Sagi Schwartzberg's sentencing. I've known Sagi since I was born; he is my older brother, my best friend, the best man at my wedding, and my kids' most involved and loving uncle.

Throughout our lives, Sagi was always there for me. If there was anything I needed help to solve, he was my first call, and he never hesitated. He is a caring person who, at his core, is altruistic. A story that highlights how compassionate he is for those around him is when my baby sister called and needed a ride home, from another state, in the middle of the night. Sagi did not hesitate; he got in the car, and drove hours to bring her back home. When my wife's car was hit in a parking lot, Sagi did not think twice about offering his help and legal support. That unparalleled drive to be there for us has not been matched by anybody else. Which is why, after justice is served, I will be there for him and help him the best I can to build back up—his relationships, his perspective on life, and his spirits.

As you know, Sagi was a talented lawyer who sought to protect individuals from large insurance companies and school districts. At the same time, he did a lot of pro-bono work. A great example was when he represented me in a case against my former employer—one of the largest employers in the country. Without hesitation, Sagi was not only willing to represent me, he flew to Indianapolis and Portland on my behalf with out-of-pocket expenses, and spent countless hours preparing. He learned new rules, guidelines, codes, and bylaws in order to help me and wrote a large 50-plus page report on my behalf. That's the type of brother and lawyer he was. I know I am not the only person who benefited from his pro-bono work and generosity. He loved supporting "Davids" in their battles with "Goliaths". Sagi would donate annually to charities such as Goodwill and even helped a high school tennis team with funding when the coach sought his help. Sagi has used his position and platform many of times to defend, fight for, and support young people and their families. He has a true philanthropic spirit, and I know he would have helped more in the future once he financially could support more causes.

I've spoken to Sagi many times between his first date of arrest and today. He is broken and beyond ashamed that his out-of-character conduct has resulted in the shame, pain, and suffering, not just to himself, but to his wife, his kids, his siblings, his parents, my wife and kids, and his extended family. Before you there stands a man who has lost it all, and will forever carry guilt, shame, and pain.

Before you there is an excruciating decision to make. There is no question that Sagi's conduct deserves justice. Yet in the same breath, his actions have broken him and have stripped him of everything he knows and did not appropriately appreciate prior to his actions. He will never be able to use his talents as a lawyer, and all he will have left is immense student loan debt

to pay off as a reminder of his former profession. He already lost his house, his retirement, and the future he spent building so passionately. The many causes he previously donated to, he can no longer support. The community he served no longer wants him. Furthermore, and more damaging to him on all levels, is he cannot see what he cherishes the most—his children. He was an excellent father and their lives are forever affected as a result. He will miss a crucial part of their life, which he cannot have ever again. It is gone. He won't be there. They miss him and cry. It breaks him. He is aware that he has already ruined his life and is questioning the purpose left for him without his children.

Before making your decision, on behalf of myself, my wife, my kids, my parents, my sister-in-law, my nephew, and my niece, I urge, I plea, I beg of you to find it in your heart to grace Sagi with the lowest end of the sentencing range available to you. Allow him to see a future, to have a second chance, to rehabilitate his life. Even at the low end, the penalty is severe, and his life is already ruined. I just hope that the sentencing is such that it allows him to build back up from this ruined, broken abyss he is in now. I have no doubt in my mind that Sagi will live out the rest of his life with a clean record, and I will be there for him, in the same way he has been there for me countless times, to see it happen.

I appreciate your time and thank you for your consideration of my statement.

Respectfully yours,

Lior Schwartzberg

Taylor B. Warner
3281 E. Guasti Road, Suite 175
Ontario, CA 91761

To Whom It May Concern:

Sagi and I met in law school around 2010. We were both on law review together and had some of the same friends. Upon graduation, Sagi opened up a law firm, which I always admired. When I graduated, I reached out to him because I had some questions regarding running a practice. Over the years, he has always been a phone call away for me on a variety of issues. He has helped me with business questions, legal questions, and ethics questions. Sagi has a good heart and I have always trusted his judgment.

When I heard Sagi was arrested, I was shocked to find out the charges. While I do not minimize the severity of his actions, I know Sagi regrets what has occurred. I have spoken with him recently and his regret is very evident. I think the most painful part is what he has done to his family. He will not be able to watch his children grow up and his children will not have a father. Sagi's only concern at this point is for others and what he has done to them.

I believe that if Sagi has an opportunity to make things right and to educate others regarding the dangers and damages of pornography, he will. Sagi is a good person who made a terrible and stupid mistake.

I pray that the court sees who he is through these letters of support.

Thank you for your consideration of my statement.

Respectfully yours,

Taylor B. Warner



# LAW OFFICES OF JOHN R. SETLICH

337 N. Vineyard Ave., Suite 400
Ontario, CA 91764
Telephone: (909) 481-6400
Facsimile: (909) 481-6433
Email: jrsetlich@setlichlegal.com

July 26, 2021

To Whom It May Concern:

I have known Sagi Schwartzberg for over ten (10) years. I had met him as my neighbor at my previous office space. I am submitting this letter as reference for the sentencing court. I am hopeful that this letter may assist the Court in its determination and leniency towards my friend and colleague Mr. Schwartzberg.

I have had the opportunity to become friends with the defendant during the last ten (10) years and I believe the legal field has lost an excellent lawyer. He truly was a rising star in our profession. Mr. Schwartzberg obtained large settlements and jury verdicts against insurance companies on a regular basis. But most importantly, he has tremendous character. Mr. Schwartzberg sought to always help those in need.

As I mentioned, Mr. Schwartzberg and I have been friends for years. I have known the number of good deeds he has done for others, including myself. He gave back to his community, mentored young law students, offered opportunities to interns to gain hands on experience, provided monetary contributions for his mentees and/or employees studying for the bar, and many more. In our profession, there are a lot of attorneys who, unfortunately, are not great employers. Mr. Schwartzberg worked hard to make sure he was providing competitive compensation, decent work/life balance, benefits, etc. I remember spending time working with him as he tried to do right by his employees.

For myself personally, Mr. Schwartzberg has not only been a colleague but a friend as well. I too was shocked at this. However, I respectfully implore the court to consider mental illness in his matter. To this day, I believe whole heartedly in second chances and Mr. Schwartzberg deserves that. What Mr. Schwartzberg has done is by no means excusable, but I respectfully implore the court to shed some empathy and understanding on him. None of us can imagine what may have occurred in his lifetime – what traumas he had to have faced – that may have led to this. Mr. Schwartzberg has been a friend to me and many. I have been around Mr. Schwartzberg and his family, including his children. I have seen him as a father and there has never been any indication of anything inappropriate. In fact, he has been nothing but a loving and caring father – always speaking about how proud he was. I am submitting this letter to attest to his character and to show my support during this time for him.

Sincerely,

John R. Setlich, Esq.

# Character letter for Sagi Schwarztberg

**Hearsay**

My name is Miguel A. Tovar Esq., I am currently the managing attorney for The Matian Firm APC for the Ontario Branch. We are a mid-size firm that has about 25 attorney and we practice both criminal and immigration law. We roughtly have around 900 open cases in the San Bernardino and Riverside area. I have been an attorney for 11 years now. During those 11 years I have practiced criminal law mostly in the county of San Bernardino and Riverside, California. I have been married for 4 years now to a wonderful woman who herself is a Nurse Practioner and is a front line worker during Covid.

I first met Sagi in law school as a 1L, around 14 years ago. I hit it off with Sagi right away. We would study together, go out at night together, and convinced each other that we would survive our first year of law school together. If either the Court or the Federal Prosecutor is reading this, you will remember this feeling as well. Through hard work we both survived, Sagi a little better than myself because he was invited to join Law Review. I still remember the paper he wrote about getting other agents to circumvent warrants through computers, it was interesting.

We both graduated from Law School in 2010 and both passed the June bar on our first try! That Friday, I still remember our conversation about how we were both now attorneys and all that hard work would finally begin to pay off and being so happy for each other.

During these times, the economics were terrible for new attorneys and both the private and public sector were simply not hiring. Sagi and I both opened up our separate individual practices, but I folded my within 6 months and took an associate position with a criminal firm. Every Tuesday, we would get together to commiserate about the struggles of being a new attorney over Taco Tuesdays, because they were $.50 each and it was within our current budget.

I can say with confidence that Sagi is one of my dearest friends. I was his groomsman for his wedding and he was a groomsman for my wedding. I believe it was around my 3rd year of being an attorney and I decided that I wanted to give back to society in a small way and I organized a Christmas toy drive for children who lost their parents and were waiting to be adopted. The first person I called to help me organize this event was Sagi. Sagi is of the Jewish faith and yet he was the first to help me organize a Christmas toy drive. That is that kind of guy that he is. He's a person who will always say yes when you need help. The toy drive was a great success and we even got our attorney friend Nolan King to play Santa Claus for the kids. Sagi got more involved in the Western San Bernardino County Bar Association than I did. I can say that both Sagi and I sponsored several dinners for several Judges' of the year awards, the most memorable was that of the Honorable Judge Furgerson out of the Rancho Cucamonga courthouse because of his hilarious speech where he recalls losing his first 3 trials with not one person voting guilty. It worked out for him.

This letter took me a while to write because it was too hard to put into words the value that Sagi brings in my life. I miss texting him about work, stocks, and soccer.

Sagi no doubt is an idiot for what he did. As a defense attorney, I know what an idiot he is. But he does have some worth to him as a human being. Other than this hidden transgression, I know Sagi to be a caring, honest, and hard working individual. I love that dude. I know Sagi is very remorseful for what he did and he has to pay for that.

I just simply ask that you take mercy on this great but flawed human being. Knowing everything that he is accused of, I would still put my hand in the fire for him.

Thank you for your time. With kind regards.

Miguel A. Tovar

Dear Your Honor,

I write to you today in regards to my oldest brother, Sagi Schwartzberg and his subsequent sentencing.

Although my brother and I have a ten-year age difference, we have always been close. I view him as a second, sillier, father figure. Growing up and even into adulthood, Sagi was the brother I would run to in moments of need, in moments of big decisions, in moments of extreme happiness, extreme sadness and worry. He was the brother I would always brag about to my friends, peers, educators and colleagues. I've always known Sagi to be a truthful, kindhearted and respectful person. He has always shown concern for the well-being of myself, our brother, our parents and the rest of our extended family. He is a dedicated older brother, son, father and husband. He shares in our joy and hurts in our pain. I've watched his successes and career with great pride and have seen the many ways he's helped other families and individuals fight for and obtain justice both in and out of the courtroom.

Throughout my young life, I have overcome a lot. I do not call myself a religious person, but I do call myself a spiritual person. I am a self-proclaimed religious philosopher. I believe that each person is born with two souls. One is the animal soul and one is the godly soul. The animal soul is the one that promotes negative behavior. The animal soul is the one that causes us to disengage from our morals and values, from society. The godly soul is the one that promotes positive behavior. The godly soul is the one that reminds us to serve others within our community with love and humility.

Sagi has caused harm that has brought this case upon him. His animal soul taking over his godly soul. I would like to bring your attention to a few situations that showcase Sagi's truest essence; his godly soul. I would like you to know about a time where Sagi got a call that I was in an unsafe situation while on vacation with my boyfriend at the time. My then boyfriend was being verbally abusive and threatening physical and sexual abuse. I was able to contact my parents who were unable to come help but the moment Sagi heard he got in his car and drove four hours each way in the middle of the night to come get me and keep me safe. He arranged and paid for my taxi from the hotel I was staying at and stayed on the phone with me until I reached safety. I truly believe that he saved my life that night. In spite of his conduct that has brought this case upon him, please know he is a man who has used his kind soul and resources to fight to protect me and many others. Another great reflection of Sagi's true essence and character is that after I suffered a stroke last year which has left me disabled and needing high risk brain surgery, Sagi had been researching the best places for me to try and rehabilitate, the best doctors and methods for a successful surgery and even bought a book to try and understand what I was going through physically, mentally and emotionally as a young stroke patient. I have always known him to be a person that uses his talents for good and for helping those around him who need it, in and out of the courtroom. As I stated above, he has been my pillar for the entirety of my life. He's been an essential part of my recovery by providing emotional support and physical support. While others have thrown me aside, he has stepped up and reminded me that I am still worthy of a life.

Another major spiritual pillar I believe in is the idea of repentance. I am a person who does not believe in hell because I so deeply believe in the concept of repentance and redemption. Every time I have spoken to him, he as shared his remorse and regret for the harm he has caused others. He has made no

excuses as to the past and has expressed his intentions to do whatever it takes to repent in the future. He is a humble man who knows there is no justification or rationalization for his actions. He stands before you with the greatest remorse and the highest intent to seek healing and right his wrongs.

I in no way undermine the seriousness of my brother's mistakes and charges, his mistakes require justice. Sagi is a man who thoroughly knows he has ruined his whole life which was a valuable use of his many talents and positive godly energy, where he supported not only his immediate family but extended family and friends, both financially and emotionally. He built up and kept a thriving law practice, and gave to his community whenever possible. In making this decision, I urge you to consider the lowest end of the sentencing range available to you. Even at the low end, this penalty is severe. I have no doubt that Sagi has learned his lesson and will never offend again. Every day he wakes up has been and will be a reminder to repent and live solely through his godly soul.

Thank you for your consideration of my statement.

Respectfully yours,

Dana Schwartzberg

Dana Schwartzberg

Dear Your Honor,

I have known Sagi Schwartzberg for more than 20 years, during which he became like a brother to me and another son for my parents.

I lived with him for two years while he attended Cal-State Northridge, and we remained very close when he went to law school and started his career. He was a groomsman in my wedding, he is family.

Sagi is kind-hearted, honest and would always go out of his way to help people in need. In fact, since he has become a lawyer, he has helped my family and me with legal matters without charging a dime.

My family owns and operates a Jewish market in Encino. Over the years, we have had issues with employees and vendors – Sagi was always a phone call away, always picked up and always helped – no questions asked. That's just who he is. Not only for my family and I, but for whomever needed help.

The news about his arrest, the accusations against him and the current case, came as a complete shock; not only to me, but to all those who really know him. Everyone told me "there is no way, this isn't the Sagi we know and love", and I agree. This is not the Sagi I know and love, something must have gone wrong. He is a loving husband, dedicated father and an overall good human being that was on a mission to help people in need of legal help. He always fought for the little guy.

I whole heartedly condemn his actions that lead to this case. It is wrong and should be punished. But I also believe that he should be given a second chance at life, and that is why I'm writing to support him and to ask that the punishment he receive be lenient, so that Sagi can serve his time, repay his debt to society, and get the help he needs to rehabilitate.

Knowing Sagi, I know he seriously and deeply regrets his actions. I know how hurt he is because the pain he caused everyone involved. But if there is someone capable of redemption, and coming out of this a better person, it is Sagi. I know that if he is given the chance, he will rehabilitate and become a positive member of society and his community more even than he previously was.

While I know Sagi will have a rough road ahead, my family and I will be here for him to help him get back on his feet, to become the great person he can be. Knowing him, he will better himself so he could become a person who will dedicate himself to making the community where he lives a better place.

Please give him a second chance at life, please give him a lenient sentence, our society will be better off with Sagi in it. I have no doubt.

Thank you for your consideration.

Mik Guttman

Mike Guttman
818-429-9139

Your Honor,

Today is a day that will affect Sagi Schwartzberg and his family for the rest of his life.

I know Sagi for more than 25 years. I never recall Sagi behaving in a negative way and to the contrary, I saw him time after times helping people and encouraging them to work hard and achieve their goals. Specifically, he was always available for my daughter during her first/second year at law school. His advices and inspiration helped her a lot during her first two challenging years. Additionally, Sagi helped one of my coworkers and myself in issues that required his knowledge and expertise, without charging for this help.

Your honor, in your judgment I hope that you will consider that: (1) this is the first and only time that Sagi is involved in illegal act. (2) Sagi's sister suffered a stroke in the middle of the Covid-19 year.

The Family has enough in their plate. Two innocent babies (Sagi's children) are going to lose their father for his mistake. This will affect the rest of their life.

Life will never be the same for them and his wife. Sagi is already spending time in jail for few months, lost his reputation, lost his practice, which he built over few years, and lost friends.

I hope that your honor will consider the minimal possible sentence, given that Sagi has a clean record, he suffered a lot for his mistake, as a lawyer he will become a prisoner and will pay for his mistake for the rest of his life.

As a father of another daughter who have been fighting cancer for 9 years, and now living at our home in hospice conditions, I hope that the Schwartzberg family will not have to suffer due to Sagi action more than it is necessary.

In summary, I am asking your honor to use your judgment with mercy and allow Sagi serve the community as part of his punishment, if allowed.

Respectfully,

Ehud Shany

President/CEO

WinSoft Inc.

Dear Your Honor,

I am writing to you in regards to Sagi Schwartzberg sentence.
I am Sagi's mother, the one that went through the ups and downs throughout his life, like any parent would, and raised him to values of honesty, contribution to the society, charity, help to the less fortunate, and respect to others.

Sagi is an honest, caring and loving family person. His family means everything to him. He was always kind to others and volunteered his time to help others succeed, regardless of how busy or demanding his personal life was.
He developed his career with hard work and absolute dedication, and became committed to help fellow colleagues and young or aspiring lawyers reach their full potential and develop their own careers. He helped so many people get justice, save their homes, their careers, their reputation, many times for free out of generosity and compassion. He has a huge heart and loves to give and help others.
I have seen him support his business partner financially for years, gave him a job until he finally passed the bar'and was able to work as an attorney. He fought the system to help him save his home from foreclosure and negotiated for him a deal he could afford.
He is a good man, who made very bad decisions with poor judgement, without thoroughly thinking...

I've spoken to Sagi about his actions in this case multiple times. No one, not even Sagi himself, can understand how a gentle and caring person like him got drawn into such dark place... something must have gone wrong and he was not able to help himself the way he helped others. He understands and acknowledges how shameful and harmful his actions were. He made no excuses, he is terribly regretful of the pain and suffering his action have caused. He knows there is no justification or rationalization for his actions. He is ashamed, embarrassed and regretful, and stands before you remorseful and humble.

I would like you to know that Sagi has been an amazing father, a caring and loving husband, a true family man absolutely instrumental in the daily functioning of his home. From cooking the meals, preparing the kids to school, do bath and dinner time with them even when that meant to stay late at night and continue his work. His kids are his world. Since his arrest he has been writing and paining his kids books about the adventures of a character he created, to help them coup with his sudden absence. I totally understand that his actions show him as a totally different person, but he is a good person who truly cares about others and would never intentionally cause harm, in particular to kids or young people.

He has a young sister, 10 year younger, to whom he is like a second father and he has been always watching after her. In one occasion where she was in a dangerous relationship that turn abusive, he drove in the middle of the night over 4 hours to bring her home safe. Unfortunately she suffered a stroke last year, which left her half paralyzed and in need of high risk brain surgery, and Sagi has been the pillar on which she could lean, and helped us navigate through the insurances maze and figure the right treatments for her.

I wanted to share with you the case of Kennedy LeRoy, a 16-years boy with Asperger's syndrome who committed suicide because he was bullied at his school. Sagi was his family attorney and fought on their behalf to attain justice. Even thou he was fully aware that his chances again the school district were slim, he took the case because he believed in the cause. He did substantial work with no payment, committed to fight for the family and the young life lost, causing his firm significant loses regardless of his partner disagreement and, at times, causing friction between them.

In spite of his conduct, please know he is a man who has used his professional talent and experience to fight for young people.

I understand that I'm pleading you to make a hard decision. On the one hand, Sagi's actions were wrong and require justice. On the other hand, there is a man who fully knows his action harmed others and destroyed his whole life, the life of a recognized lawyer which used his talents, motivation and good character to maintain a successful practice, give to the community and support his family. Everything he did and achieved to this day is gone.

In making this decision, I plead you to consider the lowest end of the sentencing possibly available to you. I know that even at the low end, the penalty will be severe and I beg you to take in consideration the good he has made in this world, and the good he can still contribute to the community. Please don't take away his second chance and hope to rebuild a life of purpose. I know Sagi has learned a valuable lesson that will turn his life into one dedicated to help others and give back to the community and society. He will take any step needed to rehabilitate and I have no doubt that Sagi not only will never cross to the wrong side of the law again, but he will focus his next chapter of life in fixing his mistakes, and advocating for good causes.

Thank you for your consideration of my statement.

Respectfully yours,

Gabriela Schwartzberg

2

June 27, 2021

To the Honorable Judge,

I wish to express to the Court my first-hand knowledge and experience of the good and moral character of Sagi Schwartzberg, to be considered during his forthcoming sentencing procedure.

I am a 38-year-old mother of three young children, and Sagi is one of my husband's oldest and closest friends, since they were in middle school. I have known Sagi for about 10 years and I have always thought of him as a close and trusted family friend, someone in whom our family has complete confidence and cherishes as a valuable part of our close-knit social circle, and an upstanding and respectable member of the community. I have seen many times how Sagi is very considerate of others, showing genuine compassion and a willingness to rush to aid and support those in need.

More specifically, Sagi rushed to my defense when I was the victim of a horrifying act of online sexual harassment a few years ago by a man who I had briefly dated a few years earlier, before I met my husband. Several years after our brief relationship, I was made aware that this man had published a "live journal" on the internet, giving falsified accounts of sexual encounters during our time together, including the use of my name. In addition to being untrue and slanderous, this man most definitely did not have my consent to reveal any private information whatsoever, and I suffered a great deal of emotional shock and trauma simply coming to terms with what was happening. My husband turned immediately to Sagi for help, and he wasted no time in writing a formal "cease and desist" letter for using my name without consent and falsifying accounts of sexual encounters between us. My name and the falsified stories were very quickly removed from the internet by the man who had posted them, and fortunately the incident has never repeated itself. I do not know what I and my family would have done without the support, compassion, and willingness to help that Sagi displayed without hesitation; I will always be grateful to him for coming to our defense and standing up for justice.

Needless to say, I am aware of the specific charges against Sagi, and I am all too familiar with the type of emotional damage that can be caused by such actions. I am also aware that Sagi has admitted to his wrongdoing and repeatedly expressed remorse for his actions, behavior consistent with his general character as a good and moral person. After all, people make mistakes, and of course they must be punished appropriately to make sure that they will not repeat those mistakes through understanding the impact of their actions. There is no doubt that Sagi must "pay the price" before he will be able to return to his life and begin rebuilding anew. I and my family beg of the court to exercise any measure of compassion and leniency permitted by law, to prevent Sagi from being permanently excommunicated from a society to which he has contributed so constantly and so caringly. I believe that with the support and understanding of the Court, Sagi will be able to serve the penalty for the damage he has caused, while knowing that he still has the rest of his life ahead of him to do better and give back more and more.

Respectfully Yours,

Barrie Guttman

Gisselle Chingirian
23084 Via Pimiento
Mission Viejo Ca 92691

July 11, 2021

Re: Sagi Schwartzberg

To the Honorable Judge,

My name is Gisselle Chingirian, I am married to Roy Chingirian who is friends with Sagi
Schwartzberg. I have personally known Sagi for 8 years and since then he has become
part of my family. He was a groomsman at our wedding and has attended all family
functions along with his wife, Becky and kids Leo and Emma. He has always been a
loyal friend who has the ability to make my husband laugh in the most stressful
situations. Sagi is the friend that Roy and I would lean on for legal and personal advice.
Friends like him do not come around very often.

I am aware of the seriousness of Sagi's lapse of judgement and was completely
shocked when I heard about the accusations. I felt compelled to write this letter. Not to
take away from the seriousness but to show the Sagi that I have gotten to know over
the years. The great friend, father and attorney who has helped many people.
We recently had a family outing with the Schwartzbergs to the zoo, and I was truly
impressed about how attentive Sagi was to his wife and kids. The relationship between
Leo and Sagi is truly one of a kind. He has always shown to be a very hands-on father
to both of his kids.

Sagi has always made himself available to my husband and I and those closest to us. 5
years ago my sister found herself in the middle of a separation. Sagi took his time and
his knowledge and gave my sister all of her options and showed great empathy and
compassion in such a vulnerable time in her life. His kindness exceeded her
expectations and until this day she speaks very highly of her experience with Sagi.

I want to thank you for taking your time in reading my letter. It is my sincere hope that
this letter helps you see a different side of Sagi. The side that loves those around him
enough to take the necessary steps to rehabilitate himself and continue being a stand
up productive member of society.

Best Regards,
Gisselle Chingirian

June, 2021

Dear Your Honor,

I am writing to you with respect to the sentencing of Sagi Schwartzberg. I am his older cousin and have always had a close relationship with him; like a big sister for him.

Sagi has always been a family person; he never missed a birthday, holidays, or any opportunity to enjoy a family gathering. He is like an uncle to my kids, who adore him dearly because he would always engage them in play and conversations.

This is very hard for our family and we are deeply saddened by the situation, especially for his wife and kids. But I have received a very thoughtful and emotional letter from him a few weeks back. He is ashamed and remorseful, he asked for forgiveness for the pain and shame he may have caused all of us. He made no excuses for his actions and sincerely regrets having put himself and his family in this situation. He sounded devasted and deeply sad.

My heart breaks every time I think about how a talented, kind, and generous guy like him, who was always ready to help anybody with a smile, could have put himself in this situation. My heart breaks when I think what a loving, dedicated, and devoted father to his beautiful young kids he has always been. It breaks to think that these kids will grow up not to enjoy his positive and joyful presence.

Having been a close witness to his entire life, and knowing he comes from a family of strong integrity and law-obeying values, I believe this was a huge mistake made by a flawed human being. I am not going to try to defend or justify his actions of the past, but I know he will take any chance to amend his mistakes in the future. I beg you to consider the lowest range of the sentencing available to you when making this decision, as I am confident, he will never offend again. I beg you on behalf of those two little kids that deserve and need their father in their life.

Thank you for your consideration of my statement.

Respectfully yours,

Andrea Paz

6/21

June 25, 2021

May it please the Court,

I wish to address the court regarding the sentencing of Sagi Schwartzberg, one of my oldest and closest friends. We met in middle school, when Sagi was new to this country, and our friendship has remained constant ever since, including the mutual honor of serving as groomsmen at each other's weddings. Over the years, Sagi has been a considerate, supportive, and kind friend to me and my family, throughout the ups and downs of life.

I have seen time and again that Sagi's approach is not unique to our specific friendship; he makes a point of treating people with empathy, compassion, and a generous heart. He would offer his car to a friend when he was unavailable to give them a ride personally, and he has been called upon innumerable times to be a "shoulder to cry on" for those in distress. He has always been concerned for those around him and done everything in his power to help ensure their wellbeing. In the year 2004, Sagi came to the legal aid of my wife when she was the victim of vicious online sexual harassment at the hands of a person she had dated briefly before we ever met. Sagi gave freely of his time and expertise to help guide us through the difficult and emotional process of confronting the offender and securing a swift conclusion to the traumatizing ordeal.

I am fully aware of the severity of the charges currently facing Sagi; we are still very close friends and in recent months we have continued to speak as frequently as circumstances permit. I can confidently state that Sagi does not disavow himself of culpability in this matter. He has been honest with himself and confronted the impact of his actions, expressing great remorse about the damage done and a clear understanding of the need for reconciliation. He knows well that the journey ahead is an arduous one, and that only through personal accountability will he be able to emerge on the other side and move forward with his life. I have stood by Sagi's side throughout this dark time and will continue to do so as long as I am able, knowing full well that he would do the same for whomever he could, as evidenced repeatedly over the years.

There is no doubt that the demand for justice must be fulfilled and Sagi be held responsible for his actions and their consequences. My hope is that the court will see fit to provide the slightest measure of mercy, given Sagi's strong moral character and background as a productive and well-adjusted member of the community. This small modicum of leniency may be the only thing that affords Sagi the opportunity to rejoin society as a better human being, after he has completed his sentence, whatever it may be.

Respectfully yours,

Alon Guttman

Dear Your Honor,

This letter is written in respect to the sentencing of Sagi Schwartzberg. I am Sagi's wife, Rebecca Schwartzberg.

I would like to preface this statement noting my approach of full disclosure. Writing this letter was not an easy decision for me, as I still have so many emotions competing with each other constantly. Honestly, the reason I decided to submit anything at all, is because I believe that even with the hurtful, confusing, and completely reprehensible elements of this case, Sagi is one of the kindest and most giving people I have ever known. This is painful for me to write, as I know many of the accusations he has pled to, and they make it difficult to understand some of the amazing qualities I know him to have, and have loved him so dearly for.

Sagi calls me every day to express his regret for his actions, and for the pain he has caused so many. In our conversations, neither of us allow any excusing of his behavior; there is just a mutual desire to understand what ultimately caused him to go down, and continue down the path he did. Although there are so many challenges I have been facing being a single parent to our two children, I have told Sagi that what pains me the most is the void in our children's lives because of the choices he made. I've told him that it almost would have been better if he had been an absent father, because the void the children currently have is so painfully apparent every day. I always thought of myself as one of the luckiest wives out there in having Sagi as my partner in life. The care and attention I saw him give to his family, friends, and colleagues throughout our early years together, multiplied so many time over once he became a father. Amongst all of my friends, Sagi was hands-down the most involved dad I have known. He would have done anything for the kids' happiness and well-being, and he was loving and attentive to them every single day.

Yes, I have many questions that are still unanswered, and I have many feelings of anger, hurt, confusion, and betrayal, but I painfully have to be honest with myself that it does not take away from the loving person that I, his children, and so many others know him to be. Often, I used to encourage Sagi to focus on his own health and stress levels by pulling back on putting others first; helping so many colleagues free of charge, and going out of his way to help friends and extended family with personal issues when he was already so busy with work and home life. Sagi is a people pleaser by nature, and always wants everyone to be happy. He thrives on being social, and being loved. His rise in the community was not only due to his drive and skill, but because he was beloved by so many who grew to know him well. I cannot explain away or defend his actions by any means. There is indisputably a part of Sagi that needs to be understood and treated, but I can't say that I believe his inexcusable actions define the person he is. As a wife and as a mother I am extremely angry, disappointed, and hurt by his actions. Sagi does not argue with me regarding any of these feelings I express to him. He understands the gravity of what he has done and the pain he has caused, and feels nothing but remorse every second of every day. He knows he cannot change what he did, and is unsure of what relationships he may be able to repair, but he can only hope to somehow make amends eventually with those affected by his actions, and also properly address the root of his actions with a professional's guidance.

In making this decision, I am hopeful you consider the lowest end of the sentencing range available, as his penalty will be severe even at that. I believe that Sagi will never offend again.

Thank you for your consideration of my statement.

Respectfully yours,

Rebecca Schwartzberg

Law Offices

**TOBIN · LUCKS** LLP

801 Corporate Center Drive
Suite 120
Post Office Box 100
Pomona, CA 91769
T: 951.270.1344
F: 951.270.1348

www.tobinlucks.com

Irvin L. Lucks*
Edwin J. Lucks
Frank Christine III*
John Lamoutte*
Robert C. Tobin*
John F. Salisbury
Jeannine M. Arce*
Alan J. Beardsley
Therese M. Walsh*
Jesse R. Perez*
Gregory J. Cameron*
Brent E. Levine*
Mark S. Tobin
Sarah M. Flynn*
Mark G. Stephens*

Bruce M. Toomer*
Jessica J. Jorgenson*
Carolyn M. Lopez*
Yunna Mirolyan*
David A. Lee*
Sam D. Dardashti*
Sean V. Rivera*
Blake A. Porter
Jonathan E. Miller*
Adrian G. Rodriguez*
Leeron Volk
Timothy W. Kelly
Joel E. Gross
Nir Asseraf
Diana D. Cunningham*

Dat G. Pham
Miles A. Holm
Zareh Zadikyan
Omar A. Hinds*
Nadia A. Chehade
Marlene Raheb
Michael E. Lee
Frank V. Arebalo
Guillermo E. Ortiz
Lyla Askejian
Alaine Abesamis-Buscaino
Jason L. Barbanell
Karpis G. Ter-Kazaryan
Ryan M. Tobin

George M. Theofanis*
Kimberly G. Davidson*
Laurie V. Brumage
Nima Kashani
Anahit Millot-Audetat
Michael H. Volk
David M. Villalvazo
S. Alfonso Smith
Franco P. Yaconelli
Adam G. Roehrick
Ileen Shamaian
Mariam Maghakyan
Beau Mizoguchi
Arthur Arutyunyants

Donald P. Tobin* (Retired)

*Certified Specialist, Workers' Compensation Law,
The State Bar of California Board of Legal Specialization

June 30, 2021

Dear Honorable Judge:

My name is Yunna Mirolyan and I have known Sagi Schwartzberg since our first day of law school in 2011. We instantly clicked and became inseparable throughout that time. Sagi and I took every class together; from my first law school final to the California Bar Exam, Sagi has been there to help guide and motivate me. Of course, he passed on the first try (to no surprise) and I did not. He was incredibly supportive during my most difficult time, not only as a mentor and colleague, but a genuine friend that cared about my well-being. At my most defeating moments, he always expressed how much he believed in me.

Since law school, we have maintained our friendship, and I have him to thank for that. He always checks in on me, my husband and our child, and he was the one who made efforts to ensure we spent time together with our families. I absolutely adore his wife, Becky; she is an incredible human being. She has been a kind and generous friend to me, a supportive wife to Sagi, and devoted mother to their two darling children.

Sagi has a heart of gold, the best sense of humor, and has really shined as a professional in his community, excelling in both civil litigation and family law. He has won several high profile cases because he is a zealous advocate and passionate about his clients. He has helped so many people achieve justice, and I can attest it is simply due to the goodness of his heart.

For example, when my younger sister was going through a divorce and could not afford to hire counsel, he sat with us and helped with all of the paperwork and the legal process. There have been countless times that he has sacrificed time for himself to instead volunteer his expertise to help his friends with legal issues; for example, he engaged in a long-standing battle with a bank in order to help a friend avoid eviction from his home.

**Your Honor, our mistakes are meant to guide us, not define us.** Good people make bad choices. With my entire heart, I do not believe that his mistake defines his character. More importantly, Sagi's character is one that does not take opportunities for granted; he embraces and appreciates chances given to him that are for his own personal growth and well being. Sagi will only learn from this mistake, as we all do as human beings. Thank you for giving me the opportunity to show you some insight on Sagi's character and I hope it will help you determine how to best guide him from this moment on.

Thank you for your time,



Dear Judge,

I am writing to the Court with respect to the sentencing of Sagi Schwartzberg. I am a friend and fellow law school graduate who has known him for over 15 years.

From the time I met him in Law School to seeing him in the Courts advocating for his clients, Sagi is known to be a caring, kind, and honest person. He was outgoing personally and professionally. I have personally watched his legal career and observe try to achieve justice for his clients and do good overall. We would discuss new and better ways to practice law and help others. From new cases to motions to get experts on cases, he would always strive to help others.

The Court in these cases is generally left with a difficult decision. On one side of the scales of justice are the obvious lives which have been damaged and can never be the same. There is also a man who knows he has damaged his own and his families lives. The Court should be aware that from where I stood, he lovingly supported his beautiful family, upkept a prospering legal practice, and gave to his community. In making this decision, I urge the Court to consider the lowest end of the sentencing range available. Even at the low end, this penalty is severe. I have no doubt that Sagi will fully rehabilitate never to offend again.

Thank you for your consideration of my statement.

Respectfully yours,

Bobby Shamuilian



Dear Honorable Judge,

I humbly write to the court in respect to the sentencing of Sagi Schwartzberg in his matter. I am a practicing attorney in Rancho Cucamonga and an Adjunct Professor at the University of La Verne College of Law where I have seen Mr. Schwartzberg thrive in the legal arena over the years while giving back to the community.

As a former law student, Mr. Schwartzberg tremendously contributed to University of La Verne while maintaining his own thriving law practice. As a student, I looked up to the amazing trial skills he had in civil cases and how he effectively represented his client's interest while being a zealous advocate. Specifically I remember when I was a new law graduate searching for a job and no one would look at my resume given my lack of experience. However, after meeting Mr. Schwartzberg at an informal lunch he immediately gave me a job opportunity and his business card. He essentially took a chance on giving me an opportunity to begin my career despite my lack of experience.

Similarly on Mr. Schwartzberg taking a chance on me and giving me a opportunity as a new law graduate, I respectfully ask the court to consider giving Mr. Schwartzberg an opportunity to be a free man again. This experience has significantly affected his family, friends, and all that he knew to be his life. He has expressed sincere remorse, and all though there are no excuses for what he did, his great contribution to the community and myself should be a foresight towards where he will be if given compassion on sentencing.

I greatly appreciate the court in considering my statement, and should anyone have any questions feel free to contact me without hesitation.

Respectfully,

**Arie Shamuilian Esq. / Professor of Law**

**Email: Arie@MyRightsLawGroup.com**

**Office: 888-702-8882**

**Cell: 909- 609-8271**

# DAVID M. GOLDSTEIN
## Attorney at Law

10737 Laurel Street, Suite 100
Rancho Cucamonga, CA 91730
Telephone: (909) 466-4757
Fax: (909) 980-5525

July 19, 2021

Re: Sagi Schwartzberg

Dear Your Honor:

I am writing you in regards to Sagi Schwartzberg. I practiced alongside Mr. Schwartzberg for years. I also served along with him on the local bar association board. Sagi consistently donated his time to our local bar. I have watched him practice law. He has always shown care and consideration to his clients and to court room staff. I have always witnessed Mr. Sagi to be an honest and caring person.

I have spoken extensively with Sagi about his situation. He is truly remorseful for his victims in this matter. He freely acknowledges his conduct. He makes no excuses. He is aware that he hurt innocent people. He stands before you ashamed and humiliated.

Sagi understands that actions have consequences. He has suffered some of them already in terms of hurting those dear to him. He has always loved and supported his family. He used his legal talents to help clients. I would ask your honor to please consider these words in sentencing him. I guarantee that Sagi will do his time and will never re-offend.

Thank you for your time and consideration.

DAVID M. GOLDSTEIN
ATTORNEY AT LAW

DG

# EXHIBIT B

## Defendants Statement

I failed. I failed as a husband, father, lawyer, and most importantly, a member of our Society. I failed to follow, and respect, the law, in fact, I broke the law that I swore to uphold nearly 11 years ago when I was sworn in as a lawyer. I am disgusted with myself, disappointed in myself, and ashamed of myself for what I've done. I take full and complete responsibility for my conduct and the offense. I deserve to be punished.

Since my arrest on February 17, 2021, subsequent incarceration on March 1, 2021 and placement in solitary confinement on March 11, 2021 for both my fear and jail suffering, for my safety due the the nature of my charges and my profession, I spent a lot of time reflecting on, and thinking about what led me here— where things went wrong and what choices I made that caused me to commit the offense and why I forgo to utilize appropriate assistance, or take appropriate steps that would have prevented my commission of the offense by obtaining better _____, relying on support family, friends and hands on counsel.

I now know that prior to the offensive conduct, I was dealing with a significant and increasing amount of stress. My stress and life troubles are not an excuse for my conduct — everyone faces life stress and troubles and doesn't commit crimes because of it — but I believe this stress, along with my lifestyle and my failure to take appropriate steps to eliminate it, control it and/or manage it, combined with my self-justification for my actions spiraled into the conditions/events that lead to the commission of the offense. It seemed like the more stress piled on, and with failure to manage it, the more I engaged in the offensive conduct.

I was one of the partners in a law firm for several attorneys (myself included) and 5 full-time staff. Just prior to the commencement of the offensive conduct, our firm was on the down slope, I'm going _____ to the point that my partner and I were on _____ for some time and my partner actually loaned the firm

$35,000. At the same time we were involved in contentious and expensive litigation over a premise at another law firm that I was involved with. After we sued, they counter-sued, and named my partner and I personally. We had no money to pay for attorneys to represent us, so since I handled civil litigation I was tasked with representing our firm and ourselves. Between the ever increasing amount of time this case took, along with active legal cases, most of which were taken on contingency, and the concern over the financial status of the firm, I took on a lot of stress and work to make sure our firm had the money to support the staff and my family. I worked myself to death trying to maintain a successful image, as well know, one requires maintaining a good reputation, and being sharp. I was unable to say "no" when friends and family needed legal work, usually pro-bono. I was overworked, overwhelmed and at a breaking point.

At a certain point around this time, I returned to what I used to call "porn." I found myself going on the app when I needed a break, while working, late nights, either at the office or home. Eventually, the chat groups got into what went from those who shared regular pornography, to those who shared underage/child pornography. At first I was in a passive mode, but that lead to my sharing of photos and videos I saw in some groups with other groups. At the time, I knew this was wrong but I justified it to myself by telling myself that I wasn't downloading it or sharing or touching or whatever and sharing it, so it was a "victimless crime." I tried to convince myself of this. I knew it was wrong, and my justifications were false.

Around the same time, I saw a painting on a website I used to visit from time to time called "Ishan." The painting was _____

girls who sell photos/videos of themselves on Kik or Snapchat. The first time a girl was identified not to ask any girls I would stop contacting any one, and older regarding her. I bought photos/videos of her. I then realized that I liked buying photos/videos more than viewing commercial porn because it felt more exclusive. I then started looking for more "sellers" on various apps, and every girl I bought from if she knew or other sellers. Even if they looked young, I didn't bother confirming that they were adults.

As time passed, and stress continued to increase my money concerns - especially during the COVID-19 Shutdowns where my wife and I had to balance working from home and caring for our 2 young children full time as their daycare closed, and my younger sister suffering a catastrophic medical condition who I was dealing with, I found myself back to more buying more phones/photos from girls - even from one who asked me to pay her in gift cards instead of venmo or cashapp because she said she wasn't old enough to use those payment methods. She was the one who told me when I asked her to sell photos/videos, and I verbally agreed asking her how old she was even though she looked young, while she was the only girl that asked to be paid with "Vanilla" gift cards. She was not the only girl who looked young - I did either could or bothered to ask or confirm ages of the girls I was buying from.

My use of the Kik app and belonging to groups that shared child pornography, and forwarding content from group to group, and buying photos/videos increased. While I never shared pictures or videos I bought of young-looking women because I felt they were "mine" and felt the photos/videos were exclusively mine. I did save many on my phone so I could view them when I had free downtime. The use of Kik and purchasing photos/videos from various girls became a habit- even an addiction - that occupied more and more of my time.

Instead of talking to my wife about my struggles and feelings, I ignored/neglected my marriage. Instead of talking to my partner about my watch lists and our sharing of profits, I just kept taking on cases and fighting the personal litigation over the attic picture even though I wanted to settle it because my partner disagreed. Instead of facing, and speaking to, a therapist, I told myself that I didn't need one because I was a single caregiver. But I didn't.

After a few months of engaging in the offensive conduct, I finally told myself "What are you doing? This is wrong. You have a good life, great career and loving wife and kids. This conduct you end you & our new family." As a result of realizing just how wrong my conduct was, in or about December 2020, I deleted the ____ app, and a few weeks later I deleted the Dropbox app. I failed however to delete the app where I saved the photos/videos I purchased over the previous months.

Once I deleted the apps, I swore to myself that I would never again engage in this terrible behavior, and that if I got the urge to do so, I would seek help. I didn't want to ____ to risk the life I built for me and my family, and the career and reputation I worked so hard to achieve. I had the false belief that I had self control and didn't need help. Two months later, I was arrested and subsequently charged for my conduct.

Words cannot express how horrible I feel, not because of the shame and embarrassment of being caught and not because of the consequences my arrest has, and will have. But how terrible I feel about actually engaging in this conduct to begin with. This conduct was not only wrong, moral and otherwise, it was ugly and my self justification in continuing to engage in

④

It over time is just as bad. Child pornography is not a victimless crime. Just viewing it and wanting/sharing it creates a marketplace for it which in turn encourages people to sexually abuse children and record this new conduct. But as I have justified and made/paying in the fondness/tried of the harm to these poor helpless children because the are not the abuser, but they have to live in fear and embarrassed for the rest of their lives knowing photos/videos of their are out there. I am ashamed and disgusted with myself for perpetuating this evil cycle and harm.

In buying photos/videos from the dark web, I also took advantage of situations where young girls share such content available. Instead of justifying my purchase by telling myself that they are doing it out of they own free will or that if I don't buy someone else will or that they were doing it anyway, I should have opposed these girls to beg — especially the girls who were under 18.

I would give anything in the world to turn back time to make sure I never committed the offense and never hurt the victims or perpetuated the harm to those depicted in the photos/videos I saw and forwarded.

The amount of guilt I feel for the pain and harm my conduct caused and will continue to cause is unbearable. The pain and harm I caused to the victim and their families; the pain and harm I caused my family. Especially my wife and kids, as the fear how my children will suffer when they grow up and learn of my actions that result in them growing up without me. The pain I caused my business partner and employees; and the pain I caused my friends and colleagues.

Not a day has gone by that I haven't felt the pain from this guilt, the shame and embarrassment and the feeling of unbearable regret. Not a day will go by for the rest of my life that I will not feel the

... from the guilt, the shame, embarrassment and regret for my actions. I can't believe I failed to use available resources at my disposal to communicate our only the steps to use companies to engage in the different levels.

As I start to rebuild my life, I will use all available resources to ensure I learn to manage and control my anxiety and manage whatever compelled me to commit this terrible offense. I will never forget this experience and will do everything in my future to rebuild and become an upstanding member of society again.

I will never be able to apologize to the victims, their families, my family, kids, colleagues and friends enough. I only hope and pray that they can all heal from the impact my offense inflicted. I will do everything and anything in my control to help them heal if given the opportunity. I am forever truly sorry.

I respectfully request that you consider the reflections I share here in considering a sentence for my crime.

Respectfully Submitted,

Sam Schwartzberg

EXHIBIT C















# EXHIBIT D



TO LEO and EMMA:
I wrote this book just for you, and
hope you like it. I can't wait to
see you, play with you, hug you and
kiss you again! I miss you so Much!

Always remember,
May the sun always shine upon your face,
May the wind always be at your back,
and may the wings of destiny carry you
along to be whoever you want to
be. I Love you to the Moon and
back.

Love,
Aba





BEFORE HE GOES, PETE GETS READY.
HE PUTS ON HIS PANTS AND SHIRT, AND
SOCKS AND SHOES.
CAN YOU TELL WHAT COLOR SHIRT
PETE IS WEARING?
PETE IS NOW DRESSED!

2

NEXT, PETE GETS A BACKPACK READY
WITH THINGS HE MAY NEED ON THE AIRPLANE.
PETE PACKS PAPER AND CRAYONS, AND
A LITTLE SNACK. THIS WAY PETE CAN
DRAW AND COLOR, AND EAT IF HE
GETS HUNGRY!

3

# EXHIBIT E

71 Cal.App.5th 737
Court of Appeal, Fourth District, Division 2, California.

Paula LEROY et al., Plaintiffs and Appellants,
v.
Diana YARBOI et al., Defendants and Respondents.

E072951
|
Filed 10/27/2021

**Synopsis**
**Background:** Parents of 15-year-old student, who committed suicide in their home two days after finishing his sophomore year of high school, brought action against school district, and the school's principal and assistant principal, asserting a statutory claim for negligence and a claim for violation of Title IX, alleging defendants negligently failed to address and prevent student's suicide due to their inadequate response to his complaints of bullying by his classmates. The Superior Court, San Bernardino County, No. CIVDS1605318, Keith D. Davis, J., 2019 WL 2615062, granted summary judgment to defendants, and parents appealed.

**[Holding:]** The Court of Appeal, Codrington, J., held that defendants had statutory immunity from liability for student's death.

Affirmed.

West Headnotes (3)

**[1]**   **Education** ⮞ Duties and liabilities in general
   **Education** ⮞ Self-inflicted injuries; suicide
   **Public Employment** ⮞ Particular torts

   School district as well as high school's principal and assistant principal had statutory immunity from liability for death of student, who committed suicide off-campus during summer break in his parents' home, even if the district and principals had breached a duty they owed student by allegedly failing to protect him from bullying on campus, since at the time of student's death, he was not and should not have been supervised by the district,

the principals, or any other employee of his school, and, also at the time, no one at the school had assumed responsibility for his well-being. Cal. Gov't Code §§ 815.2, 820(a); Cal. Educ. Code § 44808.

**[2]**   **Education** 🔑 Duties and liabilities in general
**Education** 🔑 Duty to supervise students
**Public Employment** 🔑 Particular torts

A school district and its employees have statutory immunity for a student's injuries unless the student was (or should have been) directly supervised during a specified undertaking. Cal. Educ. Code § 44808.

**[3]**   **Education** 🔑 Duties and liabilities in general
**Education** 🔑 Immunity in general
**Public Employment** 🔑 Particular torts

The portion of statute granting school districts and school employees immunity from liability for after-hours, off-campus activity by students, unless the district or employee has failed to exercise reasonable care, does not create a common law form of general negligence; it refers to the failure to exercise reasonable care during one of the three mentioned undertakings in the statute. Cal. Educ. Code § 44808.

APPEAL from the Superior Court of San Bernardino County. Keith D. Davis, Judge. Affirmed. (Super. Ct. No. CIVDS1605318)

**Attorneys and Law Firms**

Schwartzberg & Luther and Sagi Schwartzberg, Ontario, for Plaintiffs and Appellants.

Thompson & Colegate, Susan K. Beck and Lisa V. Todd, Riverside, for Defendants and Respondents.

OPINION

286 Cal.Rptr.3d 705, 397 Ed. Law Rep. 295, 21 Cal. Daily Op. Serv. 11,585...

CODRINGTON J.

 **706   *739  I.

INTRODUCTION

Plaintiff and appellant, Paula and Christopher LeRoy suffered the immeasurable loss of their 15-year-old son, Kennedy LeRoy, who committed suicide in their home two days after finishing his sophomore year at Ayala High School in Chino. The LeRoys sued the Chino Valley Unified School District, Ayala's principal, Diana Yarboi, and its assistant principal, Carlo A. Purther (collectively, Respondents). The LeRoys alleged Respondents were liable for Kennedy's suicide because of their inadequate response to his complaints of bullying by his classmates. The trial court granted summary judgment for Respondents, and the LeRoys timely appealed. We conclude Respondents are statutorily immune from liability and therefore affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Kennedy attended Ayala during his freshman and sophomore years. He suffered from Tourette's Syndrome, sensory integration disorder, and borderline Asperger's Syndrome.

 *740  During his freshman year, Kennedy was placed in a "virtual school" program in part because of his health issues. Kennedy physically attended Ayala during his sophomore year only for lunch and two periods, one of which was cooking class.

Several students, including M.D., bullied and harassed Kennedy during every cooking class. M.D. and his friends called Kennedy a "faggot" or "fag," told him "God hates fags," pushed him into the walls, threw things at him, and told him he was annoying and to stop talking.

On March 6, 2015, Kennedy reported M.D.'s bullying to Ayala administrators, telling them he "couldn't take it anymore." Kennedy told Purther that M.D. was harassing him and called him a "faggot." Kennedy did not report any other students.

Later that day, Purther talked to M.D. about Kennedy's complaint. M.D. denied calling Kennedy a "faggot" and claimed that Kennedy recently insulted him and his family. At Purther's request, M.D. signed a Behavior Expectations Contract, also known as a "No Contact Contract," in which

286 Cal.Rptr.3d 705, 397 Ed. Law Rep. 295, 21 Cal. Daily Op. Serv. 11,585...

he agreed not to contact Kennedy in any way. Because Further knew Kennedy had Asperger's, he referred Kennedy to the school psychologist. Kennedy did not "give [Further] a lot of information," so Further thought that the psychologist could get more information from Kennedy and help "if something's going on." Further also referred Kennedy to Chino Human Services.

Further called Mr. LeRoy to discuss the situation. Further explained what Kennedy had told him, that the student Kennedy complained about had been put on a No Contact Contract, and that Kennedy would have to agree to one as well. Mr. LeRoy told Further that his resolution "sounded reasonable" and thanked him for the call.

Later that afternoon, Mr. LeRoy spoke with Kennedy about his call with Further. Kennedy said the situation was "over with" and that he would agree to sign a No Contact Contract. Kennedy did not tell Mr. LeRoy who was bullying him or explain **707 what M.D. had said and done to him. Kennedy never mentioned the situation to Mr. LeRoy again.

Three days later, Kennedy signed a No Contact Contract agreeing not to contact M.D. in any way. A few weeks later, Kennedy again complained about M.D.'s behavior to Further. Kennedy stated that M.D. was doing something to cause him to suffer painful Tourette's "ticks."[1] On April 2, 2015, however, Kennedy signed an "Incident Report" in which he stated *741 that M.D. "has not spoke[n] to me." M.D. denied speaking with Kennedy after signing the No Contact Contract. Further believed Kennedy and M.D. were telling him the truth when they reported they had not spoken to one another about a month after signing their respective No Contact Contracts.

Kennedy's last day of the school year was on June 10, 2015. The following day, Kennedy slept, went bowling with a friend and his family, and then watched television at home. On June 12, 2015, Kennedy wrote a suicide note and then ended his life that evening. An autopsy confirmed that Kennedy ingested a fatal amount of diphenhydramine (Benadryl) and sertraline (Zoloft).

The LeRoys sued Respondents for Kennedy's death. After Respondents' successful demurrers, the LeRoys' operative Second Amended Complaint alleged a claim for negligence under Government Code sections 815.2, 815.6, and 820, and a claim for violation of Title IX (20 U.S.C. §§ 1681 et seq.). The thrust of their claims was that Kennedy committed suicide because of the bullying by M.D. and other students, which Respondents negligently failed to address and prevent.

Respondents individually moved for summary judgment. The trial court granted the motions. The trial court ruled LeRoys' negligence claim failed because Respondents did not breach any duty they owed to Kennedy and they were immune from liability under Education Code section 44808 (section 44808) and the LeRoys' Title IX claim failed because Respondents did not act with deliberate indifference. The LeRoys timely appealed.

286 Cal.Rptr.3d 705, 397 Ed. Law Rep. 295, 21 Cal. Daily Op. Serv. 11,585...

III.


DISCUSSION

On appeal, the LeRoys do not challenge the trial court's ruling on their Title IX claim, but they argue the trial court erroneously granted summary judgment for Respondents on their negligence claim. We disagree.

"A party moving for summary judgment bears the burden of persuasion there is no triable issue of material fact and is entitled to judgment as a matter of law. A defendant satisfies this burden by showing one or more elements of the cause of action in question cannot be established or there is a complete defense to that cause of action. If the defendant meets this initial burden, the opposing party must then make a prima facie showing of the existence of a triable issue of material fact. [Citation.] [¶] We review the denial of a motion for summary judgment de novo. [Citation.] We **\*742** strictly construe the moving party's affidavits and liberally construe the opposing party's affidavits. We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence." (*City of San Diego v. Superior Court* (2006) 137 Cal.App.4th 21, 25, 40 Cal.Rptr.3d 26.) Thus, "[w]hen deciding whether to grant **\*\*708** summary judgment, the court must consider all of the evidence set forth in the papers (except evidence to which the court has sustained an objection), as well as all reasonable inferences that may be drawn from that evidence, in the light most favorable to the party opposing summary judgment." (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467, 71 Cal.Rptr.3d 707.)


**[1]** The LeRoys argue the District is liable for negligently causing Kennedy's suicide under Government Code section 815.2, which provides that a public entity like the District is liable for the negligent acts caused by an employee unless the employee is immune from liability. (Gov. Code, § 815.2, subds. (a), (b); *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 869, 138 Cal.Rptr.3d 1, 270 P.3d 699 ["Under [§] 815.2, subdivision (a) of the Government Code, a school district is vicariously liable for injuries proximately caused by such negligence."].) The LeRoys argue Yarboi and Purther are liable under Government Code section 820, subdivision (a), which similarly provides that "a public employee is liable for injury caused by his act or omission to the same extent as a private person."

Thus, to prevail on their negligence claim, the LeRoys must establish that Respondents owed Kennedy a duty of care, they breached that duty, and their breach was the proximate cause of Kennedy's injuries. (*Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741, 747, 87 Cal.Rptr. 376, 470 P.2d 360; *Guerrero v. South Bay Union School Dist.* (2003) 114 Cal.App.4th

264, 268, 7 Cal.Rptr.3d 509 [tort liability for public entities, such as school, is based on Government Code provisions]).

Respondents contend that even if they breached a duty they owed to Kennedy and their breach proximately caused Kennedy's injuries, they are immune from liability under section 44808. We agree.

Section 44808 provides in full: "Notwithstanding any other provision of this code, no school district, city or county board of education, county superintendent of schools, or any officer or employee of such district or board shall be responsible or in any way liable for the conduct or safety of any pupil of the public schools at any time when such pupil is not on school property, unless such district, board, or person has undertaken to provide transportation for such pupil to and from the school premises, has undertaken a school-sponsored activity off the premises of such school, has otherwise **\*743** specifically assumed such responsibility or liability or has failed to exercise reasonable care under the circumstances. [¶] In the event of such a specific undertaking, the district, board, or person shall be liable or responsible for the conduct or safety of any pupil only while such pupil is or should be under the immediate and direct supervision of an employee of such district or board."

The LeRoys argue Respondents are not immune under section 44808 because they "failed to exercise reasonable care under the circumstances." (Educ. Code, § 44808.) To support their argument, the LeRoys rely primarily on *Hoyem v. Manhattan Beach City School District* (1978) 22 Cal.3d 508, 150 Cal.Rptr. 1, 585 P.2d 851 (*Hoyem*).[2] There, our Supreme Court held that a school district was not immune from **\*\*709** liability under section 44808 for the injuries a student sustained when he was hit by a motorcycle after leaving the school's premises without permission. (*Hoyem, supra*, at p. 512, 150 Cal.Rptr. 1, 585 P.2d 851.) The LeRoys argue that Respondents are liable for Kennedy's death under *Hoyem* because their negligent failure to protect him from bullying on campus led to his suicide.

We acknowledge that some language from *Hoyem* suggests that school districts and their employees may be liable for injuries a student suffers off-campus and after school. (See *Bassett v. Lakeside Inn, Inc.* (2006) 140 Cal.App.4th 863, 872, 44 Cal.Rptr.3d 827.) But section 44808 has been interpreted as imposing liability on schools districts for a student's off-campus injury only when "the student is involved in activities supervised or undertaken by the school." (*Ramirez v. Long Beach Unified School Dist.* (2002) 105 Cal.App.4th 182, 190, 129 Cal.Rptr.2d 128.) In fact, the "consensus of decisions from the Court of Appeal is that 'section 44808 limits the liability of schools for after-hours, off-campus activity, absent a specific undertaking' " by the school during which a student is injured. (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1356, 75 Cal.Rptr.3d 168 (*Cerna*).) Thus, with one exception, every court since *Hoyem*, including this court, "has interpreted section 44808 to provide that school districts are not responsible for the safety

of students outside school property absent a specific undertaking by the school district and direct supervision by a district employee." (*Cerna, supra*, at pp. 1356-1357, 75 Cal.Rptr.3d 168; *Mosley v. San Bernardino City Unified School Dist.* (2005) 134 Cal.App.4th 1260, 1265, 36 Cal.Rptr.3d 724.)

**[2]   [3]**  We agree with the great weight of authority that section 44808 " 'grants a district [and its employees] immunity [for a student's injuries] unless [the] student was (or should have been) directly supervised during a  **\*744**  specified undertaking.' [Citation.]" (*Mosley v. San Bernardino City Unified School Dist., supra*, 134 Cal.App.4th at p. 1265, 36 Cal.Rptr.3d 724; accord, *Guerrero v. South Bay Union School Dist., supra*, 114 Cal.App.4th at pp. 271-272, 7 Cal.Rptr.3d 509.) We in turn agree that "[t]he portion of section 44808 that refers to failing to exercise reasonable care" that the LeRoys rely on "does not create a common law form of general negligence; it refers to the failure to exercise reasonable care during one of the [three] mentioned undertakings" in section 44808. (*Bassett v. Lakeside Inn, Inc., supra*, 140 Cal.App.4th at p. 871, 44 Cal.Rptr.3d 827; *Cerna, supra*, 161 Cal.App.4th at pp. 1356-1357, 75 Cal.Rptr.3d 168)

Kennedy committed suicide off-campus during summer break in the LeRoys' home while he was not and should not have been supervised by Respondents or any other Ayala employee. At the time, no one at Ayala had assumed responsibility for his well-being. Under these tragic circumstances, Respondents are immune from liability for Kennedy's death under section 44808, even if they breached a duty they owed him. (See *Cerna, supra*, 161 Cal.App.4th at p. 1357, 75 Cal.Rptr.3d 168.) Having found Education Code section 44808 applicable, we conclude the trial court properly granted Respondents summary  **\*\*710**  judgment on the LeRoys' negligence claim and need not consider [the LeRoys'] other arguments. (*Mosley v. San Bernardino City Unified School Dist., supra*, 134 Cal.App.4th at p. 1265, 36 Cal.Rptr.3d 724.)

IV.

DISPOSITION

The judgment is affirmed. Respondents may recover their costs on appeal.

We concur:

McKINSTER Acting, P. J.

FIELDS, J.

Case 5:21-cr-00148-VAP   Document 30   Filed 03/14/22   Page 77 of 100   Page ID #:224

LeRoy v. Yarboi, 71 Cal.App.5th 737 (2021)
286 Cal.Rptr.3d 705, 397 Ed. Law Rep. 295, 21 Cal. Daily Op. Serv. 11,585...

**All Citations**

71 Cal.App.5th 737, 286 Cal.Rptr.3d 705, 397 Ed. Law Rep. 295, 21 Cal. Daily Op. Serv. 11,585, 2021 Daily Journal D.A.R. 11,845

Footnotes

| | |
|---|---|
| 1 | The record is unclear as to what M.D. was doing to cause Kennedy's "ticks." |
| 2 | The LeRoys also rely on *Dailey v. Los Angeles Unified School District, supra*, 2 Cal.3d 741, 87 Cal.Rptr. 376, 470 P.2d 360 and *Calandri v. Ione Unified School Dist.* (1963) 219 Cal.App.2d 542, 33 Cal.Rptr. 333, to support their argument that Respondents are not immune from liability under section 44808. Both cases, however, were decided before section 44808 was enacted in 1976. |

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

Lydia Bangtson, Ph.D.,
Clinical and Forensic Psychology, Inc.
55 W Sierra Madre Blvd, Suite 304
Sierra Madre, CA 91024
Telephone 626-786-6769

January 3, 2022

Alec Rose, Esq.
Law Offices of Alec Rose, PC
12121 Wilshire Blvd, Suite 740
Los Angeles, CA 90025

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

Dear Mr. Rose:

Pursuant to a Court Order dated November 29, 2021, I examined the above-captioned defendant for three hours in the attorney visiting room at West Valley Detention Center, on December 20, 2021. The court order did not specify that the evaluation would be confidential but communications with you indicated that it would be and the defendant was so informed. He expressed an adequate understanding of the confidential nature of the evaluation.

In addition to communications with you, his defense attorney, the following sources of information were reviewed and considered:

1. Fontana Police Department, Confidential Incident Report, 2/17/21,
2. Fontana Police Department Confidential Incident Report, Internet Crimes Against Children Task Force, 2/17/21,
3. San Bernardino Police Department Crime Report, 2/17/21,
4. National Center for Missing and Exploited Children, Cyber Tipline Reports, 11/20/20, 2/10/20,
5. CLETS, 2/19/21,
6. Plea Agreement for Defendant, 6/28/21.

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

**Psychological-Legal Issues:**

1. Does the defendant exhibit signs or symptoms of any major mental disorder, such as a mood disorder, organic disorder, or psychotic disorder?
2. Does the defendant exhibit signs or symptoms of any sexual disorder, such as pedophilia or paraphilia? Does he possess any pathology of sexual deviation?
3. What is the risk to society, particularly to pre-pubescent females, if the defendant remains in the community for treatment?
4. Are there any treatment recommendations?

**Psychological-Legal Opinions:**

1. The defendant describes a history of anxiety problems but not sufficient for a diagnosis of an anxiety disorder. He denied any history of psychiatric treatment and did not otherwise exhibit symptoms of depression. There was no evidence of psychotic disorders, and no evidence of any neurodevelopmental or neurocognitive disorders. An MMPI-2 was administered. Results are indicative of a personality disorder, with passive-dependent features. The suggested diagnosis was paranoid personality disorder. He does not meet criteria for any diagnosis of antisocial or borderline personality disorder. He reports a history of substance use that includes marijuana and alcohol. There is also a history of cocaine use, currently in remission. I would diagnose him with Cannabis Use Disorder, Moderate, and Alcohol Use Disorder, Moderate.
2. The defendant's MMPI-2 results are suggestive of sexual adjustment problems, with a tendency to get into trouble because of sexual behaviors and a general tendency to focus on sex as a major source of his difficulties. He exhibits a tendency to act out inappropriately to reduce anxiety. The defendant described being anxious and irritable, under stress at work, and engaging in inappropriate behaviors when stressed or bored. He otherwise denied attraction to minors. There was no indication of contact with minors. It is important to note that most individuals who engage in viewing of child pornography rarely escalate to contact sex offenses. I would diagnose him with a Paraphila, based on a tendency to engage in sexually compulsive behaviors that includes viewing of internet porn.

2

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

3. The defendant obtained a score of 0 on the CPORT. Average score is
   1.94. Factors that contribute to increased risk are impulsiveness,
   sexual adjustment problems, a tendency to be promiscuous, and a
   tendency to engage in compulsive behaviors that could lead to
   inappropriate acting out. In addition, the defendant has a history of
   substance use disorders. Factors that contribute to lower risk include
   his age (over 35), his having been married, content of child porn was
   more girls than boys, and he did not have a history of sex offenses.
4. The defendant should attend a group for sex offenders. He would
   benefit from individual psychotherapy to improve affect regulation,
   impulse control, and coping with stress.

**Data and Reasoning for the Above Opinions:**

The defendant is a 38-year-old Israeli male charged with Communicating
with Minors to Receive Sexually Explicit Images. According to police
reports, Fontana police were notified of an ongoing investigation of a Cyber
Tipline report. A search warrant was authorized for the defendant's digital
communication devices. Fontana police were also notified of a child Sexual
abuse material (CSAM) investigation from Rancho Cucamonga. The
defendant used Kik to upload five CSAM videos and photos on 2/3/20,
2/4/20, and 2/5/20.

On 2/17/21, Fontana police along with San Bernardino Sheriff's department
served a search warrant on the defendant's residence. The defendant was
contacted, detained, and read his Miranda rights.

The defendant made a statement to police. He lived at the residence with his
two children and wife. He was an active lawyer for Schwartzberg/Luther
Law Firm in Ontario, CA. The defendant had an iPhone in his possession
and provided police with the passcode. He also had a Dell laptop and a
desktop computer. No one else had access to his devices. He provided police
with the passcodes.

The defendant denied having the Kik app on his phone, although he had
previously installed it. It was not currently installed. He denied uploading or
having any CSAM and could not provide an explanation on how his email or
residence and law firm IP addresses were associated to uploads of CSAM
from Kik. He told police that he personally knew adult males that sent him

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

nude photos and he might still have them on his cell phone. When detectives
described the CSAM videos and photos, the defendant requested to sit down.
He started to cry. He could not provide an explanation for why he uploaded
the CSAM. The defendant was arrested and transported to West Valley
Detention Center for booking.

The defendant was seen for the evaluation in the attorney visiting area at
West Valley Detention Center. He was brought out for the interview by
custody staff. He was cooperative with the evaluation process and answered
questions openly. He was a credible informant.

The defendant was born in Israel and came to the US at age eleven with his
parents. He was raised by both parents, who were still alive and still
together. He was the oldest of three children and had a younger brother and
younger sister. His father worked as a production manager at a computer
company and his mother was a computer engineer. He denied ever being
physically or sexually abused as a child. He denied ever witnessing domestic
violence. He denied any use of drugs or alcohol in his home. He denied any
family history of mental illness.

The defendant reported that as far as he knew, there were no complications
while his mother was pregnant with him and his was a normal birth. He did
not have any developmental delays. He graduated high school and earned a
J.D. degree from University of La Verne College of Law in 2010. He earned
a BA degree at California State University, Northridge. He did not have any
problems with learning and was never in special education classes. He
denied having problems with attention although he described lacking in
motivation in school. He played basketball and played the electric organ. He
competed internationally on the electric organ at age 19. He denied any
problems getting along with classmates and denied getting into fights or
being bullied. He described being "rebellious" in high school but there were
no indications of behavior problems. He worked as an attorney in civil
litigation. He was married for five and a half years and said his wife filed for
separation after his arrest. He had a son, age four and a half, and a daughter,
age two. Prior to his arrest, he lived with his family at his own residence.

The defendant denied any history of psychiatric treatment. He denied ever
seeing a psychiatrist for medications and denied ever being in a hospital for

4

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

mental problems. He stated he saw a therapist briefly when he was 17 or 18 years old due to "lack of goals…I didn't know what to do with my life."

The defendant denied problems with depression. He denied problems with sleep or appetite, energy levels were adequate, and he did not express feelings of low self-esteem or worthlessness. He described feeling stressed in his work, "I felt I was carrying most of the weight at the practice. I felt responsible for making more money and I put in long hours." He did not have low motivation, "I loved what I did." He denied ever attempting suicide although he had suicidal thoughts when he was first arrested. He enjoyed being with his family, going out with his wife and with friends. He denied feelings of hopelessness or despair.

The defendant endorsed having increased energy and elation at times. However, this was of short duration and he did not meet criteria for any diagnosis of mania or hypomania. He stated that he sometimes stayed up all night working and forgot the time. He denied having racing thoughts. He denied being more social or talkative than usual. He expressed feeling irritable or easily provoked at times. He described gambling sometimes, "I never took money I couldn't afford to lose."

The defendant discussed anger issues. He stated that he could become angry, "If someone disrespects me or my family. If someone stole from me." He denied expressing anger, denied getting into fights or destroying property. He would "take a minute to calm down," watch TV or go on Facebook, "I would distract myself."

The defendant endorsed some anxiety. He stated that work made him anxious and stressed. He had a panic attack once, "I was involved in a lawsuit personally. The money was not good." He described engaging in ruminating thoughts and catastrophizing, imagining worst case scenarios. He denied ever hearing voices or seeing things others did not see.

The defendant discussed substance use history. He described using cocaine in the past, "In college, I would do a couple of lines at parties." He started using cocaine at age 19 and last used it three or four years ago in Las Vegas. He used marijuana, "I smoke a bowl or a joint every other day." He started using marijuana at age 16 or 17 and last used it a few weeks before his arrest in February 2021. He drank alcohol, about one or two glasses of wine or a

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

glass of whiskey once or twice a week. He stated that he would drink more on weekends, especially if he was out. He started drinking at age 16 or 17 and last had a drink in February 2021 before his arrest. He denied getting drunk. He reported he blacked out once in college. He denied any medical or legal problems related to drinking. The defendant also reported trying mushrooms four or five times in college, and using ecstasy in college about five or ten times. He denied any recent use or after he graduated college.

The defendant stated that his longest period of sobriety was one month. He reported building a tolerance to substances, but denied having withdrawals and denied having cravings. He denied any negative impact from substance use on his ability to work. He stated that he never lost a job or needed to call in sick because of being hungover. He denied any negative impact of substance use on his relationship with his wife and family. He denied any awareness of a problem with substances and said he had stopped using on his own but never for long. He was never in a program.

The defendant denied any history of arrests or convictions for crimes. He was never in juvenile hall and was never sent to prison. His criminal history record did not show any history of arrests or convictions.

The defendant stated he was currently charged with receipt of child pornography. He stated that during the covid-19 lockdown he was under a lot of stress about money, "I had two small kids at home 24-7. My sister suffered a stroke in Israel. I was involved in a lawsuit. I felt responsible for taking care of the case." He described being more anxious and irritable, engaging in increasing compulsive downloading of pornography. He described finding girls who were selling porn, "I would contact them when I was bored or stressed out. I don't know why child porn. I didn't know most of them were under age." He expressed feeling that he was escaping reality. He denied being attracted to children and denied having any sexual preoccupations with children.

The defendant stated that prior to the instant offense, his marital relationship was good. There was some stress from the children being home and the need to work from home. He said that his wife learned about his cheating after he was arrested. He denied any sexting with minors but said there were some sexual discussions when he was arranging to have videos and pictures sent to him.

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

The defendant discussed his sexual history. He entered puberty at age 13. His parents discussed sex with him. He first began to masturbate at age twelve or 13. He looked at porn, "Anything I could find on the internet." He had his first girlfriend in second grade but said there was no sexual activity between them. He had a girlfriend at age 15 with whom he engaged in kissing. He lost his virginity at age 17. That relationship lasted four or five months. His longest relationship was with his wife of ten years. He stated they lived together for seven years. He had fifteen to twenty-five sex partners in his life and admitted that he cheated on his wife, "She learned about it and I told her." He denied any sexual attraction or sexual experiences with males. He denied any experiences with prostitutes. He denied any sexual interest or arousal from voyeurism or indecent exposure. He had been with multiple partners, "Threesomes." He denied any sado-masochistic experiences. He denied spending time cultivating friendships with minors, did not socialize with minors, coach, volunteer, or mentor minors, and was not involved with minors in his work. He stated that prior to his arrest, he would masturbate once every three or four days.

**Psychological Testing**

The defendant was administered an MMPI-2. This is a personality test. It consists of a questionnaire made up of 567 true-false questions. Analysis of results yield information about personality and psychopathology symptoms, characteristics, and patterns. It is widely used and considered a gold standard for personality testing. It yields validity scales as well as clinical scales.

The defendant completed the MMPI-2 in the attorney visiting area following our interview. I sat with him while he completed the questionnaire. The answer sheet was sent to Caldwell Reports for analysis. Results are summarized below.

The defendant's MMPI-2 results were valid. His responses were consistent and he did not endorse any unusual, atypical, or rarely given responses. He was clearly able to read and comprehend test items. He was attentive in considering responses and did not appear to have any difficulties understanding the content or responding to the format of the test. Supplemental validity scales showed an above average score on the scale measuring his level of currently attained, recently experienced, or self-

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

perceived socio-economic status. He did not show any significant amount of conscious defensiveness and there was no indication of any intentionally self-favoring slanting of responses. He appeared to be a person of above average socio-economic status who exhibited some emotional reserve or general sophistication of self-presentation.

The defendant obtained a personality disorder profile on the MMPI-2. He tested as egocentric, immature, impulsive, childish, and demanding. Resentments of authority figures and family restraints on his self-gratifications were indicated. Recurrent family conflicts and guilt struggles were stressful and upsetting to him. He could also be seen as occasionally self-defeating and self-punishing, as acting against his own long-term interests, and as uneven in judgment and forethought. He may be seen as passive-aggressive and manipulative, and as occasionally acting out in order to evade stressful life situations. A low tolerance for frustration could lead to angry outbursts toward family members.

The defendant's profile was indicative of a mild level of depression. He was likely to feel unhappy and unappreciated, if not misunderstood. His depression was apt to have a moody quality. He could be accident prone which would support a victim role. At times, he could develop tension and anxiety around resentments that were poorly released. This tension is apt to relate directly to the behaviors that reduce his tensions rather than being vague or diffuse anxieties around repressed affects or impulses. He could alternate back and forth between acting impulsively and being self-critical of his own behavior. Despite his discomforts, his average range ego strength score predicts practical effectiveness and self-sufficiency in a reasonably good variety of areas.

There is a predictive pattern of sexual adjustment problems, such as getting into trouble because of his sexual behaviors and a general tendency to focus on sex as a major source of his difficulties. Verbalized guilt over past sexual activities would be limited in inhibiting his future behavior. His overall balance of masculine and feminine interests appears a bit more masculine than average for his age and education.

The diagnoses associated with this profile are varied. They typically have reflected personality disorders, most often those were passive-dependent in type. The traditional diagnosis suggested by the MMPI-2 results is paranoid

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

personality disorder. In addition, although he did not report an excessive use of alcohol, his score on the MacArthur Alcoholism scale was within the potential alcohol dependence range. This does indicate a risk of increasing dependence on alcohol or other related chemical agents. Stressors related to current legal problems could precipitate or aggravate his symptoms and his responses suggest a careful review of his sexual history

**Results of PCL-R**

The defendant was scored on the Psychopathy Checklist-Revised. The PCL-R is a semi-structured interview that produces information on constructs related to psychopathy, such as interpersonal, affective, lifestyle, and antisocial. It produces scores for two factors, Interpersonal/Affective and Lifestyle/Antisocial along with a total score. Information to score the PCL-R is obtained from collateral sources, such as police reports, probation officer reports, criminal history reports, and corrections reports as well as a lengthy, semi-structured interview. Psychopathy is defined by both personality traits and behaviors and encompasses criteria for Antisocial Personality Disorder as defined in the DSM-IV. It also measures traits, such as glibness/superficial charm, arrogant self-appraisal, and lack of concern for the suffering of others that are not included in the diagnostic criteria for ASPD. The construct of psychopathy encompasses the following criteria:

1. Callous unconcern for the feelings of others and lack of capacity for empathy
2. Gross and persistent attitude of irresponsibility and disregard for social norms, rules, and obligations,
3. Incapacity to maintain enduring relationships,
4. Very low tolerance for frustration and a low threshold for discharge of aggression, including violence,
5. Incapacity to experience guilt and to profit from experience, particularly punishment,
6. Marked proneness to blame others or to offer plausible rationalizations for behavior bringing the subject into conflict with society,
7. Persistent irritability.

The defendant obtained a total score on the PCL-R of 10. This indicates a Low probability that the defendant has characteristics of a psychopath. He

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

obtained scores of 1 on Factor 1 (Interpersonal/Affective) and 6 on Factor 2
(Social Deviance).

**Results of CPORT**

The CPORT (Child Pornography Offender Risk Assessment Tool) was
developed by Angela Eke, Ph.D, Maaike Helmus, Ph.D., and Michael Seto,
Ph.D. It is a risk assessment tool that is designed to predict any sexual
recidivism (which could include contact and non-contact sex offenses as
well as child pornography recidivism) among adult offenders with a
conviction for a child pornography offense. At this time, the CPORT may be
useful for ranking offenders according to risk score rather than using
probabilistic estimates.

The CPORT does not include all relevant risk factors related to child
pornography and sex offending. It was developed using available data from
a sample of men convicted of child pornography and therefore, other factors
could not be examined. There is a variety of research underway, for example
the use of the CPORT across a range of assessment situation in conjunction
with other tools, in comparison to other tools using data collected at different
times (post conviction) or in different geographic areas. The authors'
analysis identified seven variables that were associated with a greater
likelihood of any sexual recidivism. Items were scored as simply present or
not, or true-false, for a possible score ranging from 0 to 7.

While there is reason to believe that CPORT will be applicable to charged
individuals, there is currently no empirical data to support this use. This
information is intended to provide insight into individual risk factors and
provide some context for an individual's offending, but it cannot be used to
score the individual in comparison with other individuals.

In the five-year follow-up of a combined sample of 346 individuals
convicted of child pornography offenses, the mean CPORT score was 1.94.
The CPORT's mean was a significant predictor of any sexual recidivism and
any child pornography recidivism, regardless of missing items. While the
CPORT appears to perform sensibly, authors caution that the use of the
CPORT with reference to recidivism probability is not recommended until
there are further validation studies. **Therefore, it should be noted that
results reported here are to be interpreted with caution. The CPORT**

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

**also does not include all available risk factors. It is still in development, and risk factors may be added or changed.**

The defendant was scored on the CPORT. He obtained a score of 0. In the combined database from Eke, et al (in press), roughly 18% of the individuals had the same CPORT score, 0% had a lower risk score, and 82% had a higher risk score. Out of 100 individuals involved with child pornography, none would be expected to have a lower score, 18 would have the same score, and 82 would have a higher score. There is insufficient data (not a high enough sample size) for reliable recidivism estimates and there is an insufficient range of scores to meaningfully distinguish risk levels, especially when considering measurement errors in determining the side of the levels.

**Mental Status Exam:**

The defendant is a 38-year-old Israeli male seen for evaluation in the attorney visiting area at West Valley Detention Center. He presented as medium height, thin build, receding hairline, and wore glasses. He was polite and cooperative with the evaluation process. He was alert, oriented to time, place, person, ad purpose of the evaluation. Grooming and hygiene were adequate. No abnormal movements or behavior were noted. Speech was normal in rate and volume. Mood was "sad, guilty, failure as a husband and person," affect was restricted. No perceptual disturbances were noted. Thought process was logical, relevant, with no delusions noted. He denied suicidal or homicidal ideation, plan, or intent. Intellectual functioning was about average. Judgment was fair, insight was limited, impulse control was adequate.

**Clinical Impressions:**

The defendant does not exhibit symptoms of any major mood disorder or psychotic disorder. He does not exhibit signs of any neurodevelopmental or neurocognitive disorder. Results of psychological testing along with clinical interview indicate a pattern of compulsive, inappropriate behaviors related to poor affect regulation and poor coping with life stressors. There are indications in test results of a personality disorder, possibly paranoid personality disorder, or of passive-dependent tendencies. He was scored on the Psychopathy Checklist-Revised and obtained a score indicative of Low

11

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

probability of psychopathy. I would not diagnose him with antisocial or borderline personality disorder. Further information would be useful in ruling out paranoid personality disorder. In addition, he reports use of marijuana and alcohol and there are indications in psychological testing of substance dependence. I would diagnose him with Alcohol Use Disorder, Moderate, and Cannabis Use Disorder, Moderate.

The defendant exhibits a pattern of sexually inappropriate acting out. Psychological testing noted problems with sexual adjustment and a tendency to focus on sex as a source of his problems. He exhibits poor frustration tolerance and uses compulsive, addictive behaviors, including looking at pornography and promiscuous acting out, to manage stress and anxiety. He describes engaging in such behaviors when he is bored or stressed and characterizes it as escaping from reality. He does not have a particular preoccupation with minors, rather, he engages in sexually inappropriate behaviors as a way of distracting himself from anxieties and frustrations related to life stressors. I would diagnose him with Paraphilia related to compulsive viewing of internet pornography.

The defendant was scored on the CPORT and obtained a score of 0. Average score is 1.94. Factors that contributed to lower risk were his age (over 35), his having been married, not having a criminal record, no history of sex offenses, and no history of failure upon conditional release. In addition, content of child porn was more girls than boys. Factors that contribute to increased risk include poor emotional self-regulation, including a tendency to inappropriate, compulsive sexual behaviors when stressed or frustrated, substance use history, having a large number of videos and images, and activity spanning longer than two years.

If allowed to do so, the defendant should attend a group for sex offenders, such as Sexual Compulsives Anonymous (SCA) or Sex Addicts Anonymous (SAA). He would benefit from individual psychotherapy to improve emotional self-regulation, decrease self-destructive, impulsive behaviors, and improve coping with life stressors.

Thank you for a most interesting referral.

Lydia Bangtson, Ph.D

Re: Schwartzberg, Sagi
Case No. 5:21-cr-00148-VAP-1

PSY 18278

# EXHIBIT G

# Cash App

# Cash App Terms of Service

Posted: June 23, 2021
Effective: June 24, 2021

Last Updated: March 10, 2022

If you signed up for Cash App before the effective date, and you have not accepted these new terms, please click here to see the terms that are applicable to you.

*We've included annotations in the gray boxes below to emphasize certain portions of our notice and help guide you as you read them. The annotations aren't summaries, so please take the time to read everything!*

*This page explains our terms for Cash App. By using the service you agree to these terms. If you use the service on behalf of your company, your company agrees to them too.*

These Cash App Terms of Service (the "Cash App Terms") are a legal agreement between you, as a current or prospective user of the Services, and Block, Inc. (formerly known as "Square, Inc.") (hereafter, "Block," "we," "our" or us"), and governs your use of Cash App, a financial platform, which includes mobile applications, websites, software, cloud-based solutions, and other products and services (the "Service"), offered by Block. If you are using the Service on behalf of a business or entity, you acknowledge and agree

and notices have the same meaning and effect as if we had provided you with paper copies. Such disclosures and notices are considered received by you within twenty-four (24) hours of the time posted to our website, or within twenty-four (24) hours of the time pushed or emailed to you. If you wish to withdraw your consent to receiving electronic communications, contact Cash App Support. If we are not able to support your request, you may need to terminate your Account.

## III. Cash App Account

## 1. Eligibility and Account Registration

*Using Cash App requires that you open an account. You need to be a U.S. resident and at least 18 years old. If you want to use your account balance to send money to another Cash App customer, then you'll need to give us some more information about you that we will use to verify your identity.*

*This is also the part where you tell us you own the email or phone number you registered with and that the personal information you provide to us is correct. You agree to cooperate with us so that we can verify your identity. We might use third parties to help us do so.*

==You must be a resident of the United States, at least 18 years and the age of majority in your State of residence, and you must register for an account (your "Account") to use the Service.== Certain features of the Service may only be available for use in the United States. Some features, such as the ability to send money to another Cash App customer with the

balance in your Account, may be available only if you provide us with certain information about you and we are able to verify your identity.

## A. Registering, Opening, Using, or Upgrading an Account

To register, open, use, or upgrade an Account, Block may require that you submit certain information, including but not limited to your name, email address, text-enabled mobile phone number, street address, zip code, date of birth, social security number, and a government issued form of identification to Block. You represent and warrant that you own the email or mobile phone number you register with and all information entered or collected in the course of creating your Account and any information you subsequently add or update from your settings ("Account Information") is true and accurate, and you agree to keep your Account Information current. All Account Information is subject to the Cash App Copyright and Trademark Policy.

## B. Restricted Accounts

When you first open your Account, it will be a "Restricted Account." With a Restricted Account, you may link an external, U.S.-issued bank account (an "Eligible Bank Account" as defined below) to make a payment to another Cash App customer (including payments made to a Cash for Business Seller, defined below), and you may transfer funds from your Cash App Balance (defined below) to your Eligible Bank Account, but you will not be able to make a payment to another Cash App customer (including a Cash for Business Seller) using your Cash App Balance. If you have a Restricted Account and you attempt to make a payment to another Cash App customer from your Cash App Balance, then you will be given the option of upgrading your Account to an "Unrestricted Account." To upgrade your Account, you will





User Agreement ⌄

# User Agreement

## Last updated

This user agreement is effective as of February 28, 2022.

**Welcome to Venmo!**

This user agreement is a contract between you and PayPal, Inc. governing your use of your Venmo account and the Venmo services. You must be in the United States and have a U.S. bank account to use the Venmo services.

You agree to comply with all of the terms and conditions in this user agreement. The terms include an **agreement to resolve disputes by arbitration** on an individual basis. You also agree to comply with the following additional policies and each of the other agreements posted on **venmo.com/legal** that apply to you:

- **Privacy Policy**
- **Acceptable Use Policy**
- **Consent to Receive Electronic Disclosures (E-Sign Disclosure and Consent)**

We may revise this user agreement and any of the policies listed above from time to time. The revised version will be effective at the time we post it, unless otherwise noted. If our changes reduce your rights or increase your responsibilities we will provide notice to you of at least 21 days. We reserve the right to amend this agreement at any time without notice, subject to applicable law. By continuing to use our services after any changes to this user agreement

 

## Opening a Venmo Account

We offer accounts for two types of purposes: personal accounts and approved business accounts. You may only have one personal account. ==To create a personal account, you must be a resident of the United States or one of its territories, be at least 18 years old or the age of majority in your state of residence and use a cellular/wireless telephone number that you own.== Your Venmo account is a personal account unless you have received our express written approval to open a business account. In addition to this agreement, approved business accounts are also subject to the Approved Business Account Addendum.

Personal Venmo accounts let you do things like:

- Make payments with friends.
- Transfer money for purchases of goods and services.
- Buy things through an authorized merchant's mobile website, app, or Venmo business profile.
- Buy, sell, and hold certain cryptocurrencies if eligible.

**We may also offer you the ability to set up a business profile within your personal Venmo account, which you can use to receive payments for the sale of goods and services. This feature is offered in our sole discretion and may not be available to all users.**

**Except for commercial transactions expressly authorized by Venmo, for example, transactions with authorized merchants or business profiles, purchases made using your Venmo Mastercard®, or transactions that are identified as payments for goods and services, personal accounts may not be used to conduct business, commercial or merchant transactions with other personal accounts, which includes paying or accepting payment from other personal accounts held by users you do not personally know for goods or services (for example, concert tickets, electronic equipment, sneakers, a watch, or other merchandise, deposits for apartments, or dog walking).** If you plan to use your Venmo account to receive payments for goods or services, you must ask your buyer to identify that their payment is for goods and services or have a business profile. You may also find out more information about offering Venmo as a payment option on your website or mobile app by visiting this webpage.

EXHIBIT H



# Quick Facts

*— Child Pornography Offenders —*

## Fiscal Year 2020

▶ In FY 2020, 64,565 cases were reported to the U.S. Sentencing Commission.

▶ 1,023 of these involved child pornography.[1]

▶ Child pornography offenses have decreased by 35.8% since FY 2016.

**Number of
Child Pornography Offenders**



**Length of Mandatory Minimum Penalties for
Child Pornography Offenders
FY 2020**



## Offender and Offense Characteristics[2]

- 45.1% of child pornography offenders were sentenced for possessing child pornography; 41.9% were sentenced for trafficking child pornography; 13.0% were sentenced for receiving child pornography.

- 99.7% of child pornography offenders were men.

- 81.3% were White, 12.2% were Hispanic, 4.0 % were Black, and 2.5% were Other races.

- Their average age was 42 years.

- 96.8% were United States citizens.

- 72.9% had little or no prior criminal history (Criminal History Category I);
  - ♦ 9.0% were CHC II;
  - ♦ 11.5% were CHC III;
  - ♦ 3.9% were CHC IV;
  - ♦ 1.8% were CHC V;
  - ♦ 0.9% were CHC VI.

- The top six districts for child pornography offenders were:
  - ♦ Western District of Missouri (42);
  - ♦ Western District of New York (33);
  - ♦ Middle District of Florida (31);
  - ♦ Southern District of Texas (31);
  - ♦ Western District of Texas (30);
  - ♦ Eastern District of Virginia (30).

## Punishment

- 99.3% of child pornography offenders were sentenced to prison; their average sentence was 102 months.

- The average sentence for offenders convicted of trafficking in child pornography was 133 months[3]:
  - ♦ 90.5% of these offenders were convicted of an offense carrying a five-year mandatory minimum penalty; their average sentence was 121 months.
  - ♦ 9.5% had a prior sexual abuse or child pornography conviction and were subject to a 15-year mandatory minimum penalty; their average sentence was 250 months.

- The average sentence for offenders convicted of receiving child pornography was 95 months:
  - ♦ 90.1% of offenders sentenced for receiving child pornography were convicted of an offense carrying a five-year mandatory minimum penalty; their average sentence was 83 months.
  - ♦ 9.9% had a prior sexual abuse or child pornography conviction and were subject to a 15-year mandatory minimum penalty; their average sentence was 202 months.



www.ussc.gov
pubaffairs@ussc.gov
@theusscgov

— *Child Pornography Offenders* —

## Punishment (continued)

- The average sentence for offenders convicted of possessing child pornography was 74 months[4]:
    - ♦ 79.5% of offenders were convicted of an offense not carrying a mandatory minimum penalty; their average sentence was 61 months.
    - ♦ 20.5% had a prior sexual abuse or child pornography conviction and were subject to a ten-year mandatory minimum penalty; their average sentence was 125 months.

## Sentences Relative to the Guideline Range

- 39.2% of child pornography offenders were sentenced under the *Guidelines Manual*:

    - ♦ 30.6% of all child pornography offenders were sentenced within the guideline range.

    - ♦ 5.5% of all child pornography offenders received some other downward departure.
        - ◊ Their average sentence reduction was 41.6%.

    - ♦ 2.1% of all child pornography offenders received a substantial assistance departure.
        - ◊ Their average sentence reduction was 41.4%.

- 60.8% received a variance:

    - ♦ 58.5% of all child pornography offenders received a downward variance.
        - ◊ Their average sentence reduction was 38.5%.

    - ♦ 2.3% of all child pornography offenders received an upward variance.
        - ◊ Their average sentence increase was 57.3%.

### Sentence Relative to the Guideline Range (%)



### Average Guideline Minimum and Average Sentence (months)





### Sentence Imposed Relative to the Guideline Range FY 2020

Under *Guidelines Manual* 39.2%

Variances 60.8%

Within Range 30.6%

Other Downward 5.4%

Substantial Assistance 2.1%

Upward Departure 1.1%

[1] Child pornography offenders are those convicted of Trafficking in Material Involving the Sexual Exploitation of a Minor: Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor: Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic: Possessing Material Involving the Sexual Exploitation of a Minor (§2G2.2). It does not include cases where offenders are convicted of Production of Child Pornography (§2G2.1).

[2] Cases with incomplete sentencing information were excluded from the analysis. Cases that do not meet logical criteria were also excluded.

[3] Offenders convicted of Trafficking in Material Involving the Sexual Exploitation of a Minor and Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor are subject to a five-year mandatory minimum penalty, or 15 years with a prior conviction for sexual abuse or child pornography.

[4] Offenders convicted of Possessing Material Involving the Sexual Exploitation of a Minor (§2G2.2) are subject to a 10-year mandatory minimum penalty with a prior conviction for sexual abuse or child pornography.